# IN THE SUPREME COURT OF IOWA

No. 12–0650

Filed May 17, 2013

**FARM BUREAU LIFE INSURANCE COMPANY,**

Appellant,

vs.

**HOLMES MURPHY & ASSOCIATES, INC.,**

Appellee.

---

Appeal from the Iowa District Court for Polk County, Arthur E. Gamble, Judge.

Plaintiff–insurance company appeals district court's grant of summary judgment in a negligence action against an insurance broker. **AFFIRMED.**

Jason T. Madden and Thomas M. Boes of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, and James A. Pugh of Munro Law Office, P.C., Des Moines, for appellant.

Matthew J. Dendinger and Lewis K. Loss of Loss, Judge & Ward, LLP, Washington, DC, and Richard A. Malm of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellee.

**HECHT, Justice.**

A husband and wife applied for life insurance policies from Farm Bureau Life Insurance Company. The applicants later sued Farm Bureau alleging it negligently failed to notify them of their HIV-positive status. Farm Bureau settled the negligence claims, sued its insurers for indemnity, and sued its insurance broker for breach of contract and negligence in failing to provide timely notice to the insurers. We affirmed a summary judgment in favor of the insurers on the ground Farm Bureau had failed to give them timely notice of the applicants' liability claims. *Farm Bureau Life Ins. Co. v. Chubb Custom Ins. Co.*, 780 N.W.2d 735 (Iowa 2010).

Thereafter the district court granted summary judgment for the broker after concluding that even if the insurers had been given timely notice of the applicants' tort claims against Farm Bureau, coverage for those claims would have been precluded under two separate exclusions. Farm Bureau has again appealed. As we conclude the underwriting exclusion precluded coverage for the applicants' claims, we affirm the district court's ruling.

## I. Factual and Procedural Background.

The events giving rise to the present dispute commenced in Wyoming in October 1999 when John and Mary Smith[1] applied for life insurance through Farm Bureau. Farm Bureau denied the Smiths' applications for life insurance after a blood screening revealed they were both infected with the Human Immunodeficiency Virus (HIV). In November 1999 Farm Bureau sent the Smiths a letter informing them

---

[1]As information pertaining to communicable and infectious diseases is generally confidential, *see, e.g.*, Iowa Code chapters 139A and 141A (2009), we use pseudonyms in this instance as we did in the earlier appeal. *See Farm Bureau*, 780 N.W.2d at 737 n.1.

their applications were denied "due to the blood profile results" and requesting authorization to disclose the results to their physician(s). The Smiths did not respond or grant Farm Bureau the requested authorization, and they did not discover their HIV-positive status until July 2001.

The Smiths filed a complaint in June 2002 in Wyoming Federal District Court alleging Farm Bureau and other parties involved in the analysis of the blood samples were negligent in:

> (1) failing to report the HIV-positive status to the State of Wyoming; (2) failing, in violation of Wyoming common law, to report the HIV-positive results to them; and (3) failing to inform them before their blood was drawn that Farm Bureau would not tell them if the blood tests were positive for HIV.

*Id. at* 737. The Smiths sought damages for loss of present and future income, bodily injury, past and future pain and suffering, mental anguish, loss of enjoyment of life, total disability, inability to care for themselves as their diseases progressed, and other general damages.[2]

The federal district court concluded Farm Bureau owed no legal duty to inform the Smiths of their HIV-positive status and granted Farm Bureau's motion for summary judgment. The Smiths appealed to the United States Court of Appeals for the Tenth Circuit, which reversed the summary judgment order. The court held:

> [I]f an insurance company, through independent investigation by it or a third party for purposes of determining policy eligibility, discovers that an applicant is infected with HIV, the company has a duty to disclose to the applicant information sufficient to cause a reasonable applicant to inquire further.

*Pehle v. Farm Bureau Life Ins. Co.*, 397 F.3d 897, 900 (10th Cir. 2005).

---

[2]The complaint also alleged that by July 2001 the condition of one of the Smiths had progressed to Acquired Immunodeficiency Syndrome (AIDS) and the condition of the other had deteriorated to total disability.

The Smiths then filed an amended complaint in Wyoming district court seeking punitive damages and alleging Farm Bureau had breached the legal duty recognized by the Tenth Circuit. The damages the Smiths alleged in their amended complaint were similar to those alleged in the original complaint and included: "loss of past, present, and future income"; past and future "pain and suffering, mental anguish, loss of enjoyment of life, psychological damage, total disability, inability to care for themselves as the disease progresse[d], and other general damages." In June 2006 Farm Bureau and the Smiths reached a confidential settlement agreement and the suit was dismissed.

Farm Bureau subsequently sought indemnity, for the amounts paid in settling the Smiths' claims, under an Insurance Company Professional Liability (ICPL) policy issued by Federal Insurance Company (Federal) and in effect at the time the Smiths filed their lawsuit. Under Insuring Clause 1 of the ICPL policy Federal was obligated:

> To pay on behalf of the Insureds for Loss which the Insureds shall become legally obligated to pay as a result of any Claim first made against the Insureds during the Policy Period or, if elected, the Extended Reporting Period, arising out of any Wrongful Act committed by the Insureds or any person for whose acts the Insureds are legally liable during or prior to the Policy Period while performing Insurance Services including the alleged failure to perform Insurance Services.

Insuring Clause 2 of the same policy covered Farm Bureau for wrongful acts committed while performing financial services.

The policy defined "a claim" as:

a. a written demand for monetary damages;

b. a civil proceeding commenced by the service of a complaint or similar pleading;

c. a criminal proceeding commenced by the return of an indictment; or

    d. a formal administrative or regulatory proceeding brought by or on behalf of policyholders or customers commenced by the filing of a notice of charges, formal investigative order, or similar document.

The policy required written notice to Federal of claims "as soon as practicable, but in no event later than ninety (90) days after the termination of the policy period."[3]

Farm Bureau notified its insurance broker, Holmes Murphy & Associates, Inc., of the Smiths' claims on February 11, 2003. Holmes Murphy did not notify Federal about the claims, however, until more than two years after the ICPL policy notice period had expired. *Farm Bureau,* 780 N.W.2d at 740.

By letter dated April 1, 2005, Federal denied coverage based on Farm Bureau's failure to provide timely notice of the Smiths' claims. Federal also denied coverage based on the policy's exclusions for claims "for bodily injury"[4] and claims "based upon, arising from, or in consequence of the underwriting of insurance" (the "underwriting exclusion").[5]

---

[3]The policy period for the policy in effect at the time the Smiths filed their suit against Farm Bureau ended February 15, 2003.

[4]The bodily injury exclusion provided:

The Company shall not be liable to make any payment for Loss in connection with any Claim made against the Insureds:

. . . .

    g. for bodily injury, mental or emotional distress, sickness, disease, or death of any person; provided however, this Exclusion shall not apply to a Claim based solely on the Insured's failure to provide Insurance Services.

[5]The underwriting exclusion provided:

The Company shall not be liable to make any payment for Loss in connection with any Claim made against the Insureds:

. . . .

    k. based upon, arising from, or in consequence of the underwriting of insurance, including any decisions involving the classification,

Farm Bureau filed suit against Federal and Holmes Murphy.[6]  We affirmed a summary judgment in favor of Federal on the ground Farm Bureau had failed to timely notify Federal of the Smiths' claims as required by the ICPL policy.  *Id.* at 744.

Farm Bureau then filed an amended petition against Holmes Murphy alleging breach of contract and negligence for failing to provide Federal with notice of the Smiths' claims.  The parties stipulated that, in the interest of judicial efficiency, the court would first determine whether the ICPL policy would have covered Farm Bureau for the Smiths' claims had Holmes Murphy given Federal timely notice.  Both parties moved for summary judgment.  The district court granted summary judgment in favor of Holmes Murphy, concluding the bodily injury and underwriting exclusions in the ICPL policy would have precluded coverage even if Federal had received timely notice of the Smiths' claims.  Farm Bureau appeals.

## II.  Scope of Review.

We review rulings on summary judgment motions for correction of errors of law.  *Id.* at 739.  Summary judgment is only appropriate when a "moving party has affirmatively established the existence of undisputed facts entitling that party to a particular result under controlling law." *Travelers Indem. Co. v. D.J. Franzen, Inc.*, 792 N.W.2d 242, 245–46 (Iowa 2010) (alteration, citation, and internal quotation marks omitted).  When no extrinsic evidence is offered on the meaning of language in a policy,

---

selection, or renewal of risks as well as the rates and premiums charged to insure or reinsure risks . . . .

[6]Farm Bureau also named Great Northern Insurance Company as a defendant in the action.  Great Northern had issued a policy covering liability arising from Farm Bureau's acts or omissions as a financial institution.  Farm Bureau's claim under that policy was rejected in the earlier appeal, *Farm Bureau*, 780 N.W.2d at 742–44, and is not at issue in this appeal.

interpretation and construction of an insurance policy are questions of law for the court. *Farm Bureau,* 780 N.W.2d at 739.

### III. Discussion.

The parties advance diverging interpretations of the bodily injury and underwriting exclusions found in the ICPL policy. While at least some, if not all, of the damages the Smiths seek against Farm Bureau may be characterized as losses in connection with a claim for bodily injury and would therefore be excluded from coverage under the policy's bodily injury exclusion, we need not decide whether that exclusion is dispositive. Instead, we conclude the underwriting exclusion precludes coverage for any of the Smiths' claims.

The controlling consideration in construction of insurance policies is the intent of the parties. *Thomas v. Progressive Cas. Ins. Co.*, 749 N.W.2d 678, 681 (Iowa 2008). We determine intent by what the policy itself says except in cases of ambiguity. *A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.*, 475 N.W.2d 607, 618 (Iowa 1991). Ambiguity exists when the language of a policy is susceptible to more than one reasonable interpretation. *First Newton Nat'l Bank v. Gen. Cas. Co. of Wis.*, 426 N.W.2d 618, 628 (Iowa 1988). We read the insurance contract in its entirety, rather than reading clauses in isolation, to determine whether a policy provision is subject to two equally proper interpretations. *Thomas*, 749 N.W.2d at 681. We refrain from straining the meaning of the words and phrases of the policy to avoid imposing liability that was not intended and coverage that was not purchased. *Id.* at 682.

When words are left undefined in a policy, we give them their ordinary meanings—meanings which a reasonable person would give them. *A.Y. McDonald*, 475 N.W.2d at 619. We do not typically give them meanings only specialists or experts would understand. *City of Spencer*

*v. Hawkeye Sec. Ins. Co.*, 216 N.W.2d 406, 408–09 (Iowa 1974). In searching for the ordinary meanings of undefined terms in insurance policies we commonly refer to dictionaries. *See, e.g., Witcraft v. Sundstrand Health & Disability Grp. Benefit Plan*, 420 N.W.2d 785, 788 (Iowa 1988) (meaning of "illness"); *N. Star Mut. Ins. Co. v. Holty*, 402 N.W.2d 452, 455 (Iowa 1987) (meaning of "apparatus"). If a word is susceptible to two interpretations, typically we adopt an interpretation favoring the insured. *A.Y. McDonald*, 475 N.W.2d at 619. Mere disagreement, however, as to the meaning of the terms, does not establish ambiguity. *Id.* Instead we examine whether the policy language, viewed objectively, is fairly susceptible to two interpretations. *Id.* Ultimately, if there is no ambiguity, the court will not rewrite the policy for the parties. *Thomas*, 749 N.W.2d at 682.

In construing the underwriting exclusion at issue here, we acknowledge the specific words introducing a word or phrase may have implications for our construction. *See, e.g., Am. Family Mut. Ins. Co. v. Corrigan*, 697 N.W.2d 108, 112 (Iowa 2005). Some liability policies—like the one issued by Federal to Farm Bureau—exclude from coverage claims "arising from" an excluded cause. Other policies may more narrowly exclude coverage of claims "for" an excluded cause. We have said that while phrases like "arising out of" should be given "a broad, comprehensive meaning" in a coverage clause, such language may be read more narrowly in an exclusionary clause. *Tacker v. Am. Family Mut. Ins. Co.*, 530 N.W.2d 674, 677 (Iowa 1995). In cases giving "arising from" exclusions their ordinary meaning, "arising from" and "arising out of" language has been construed to mean "originating from, having its

origins in, growing out of, or flowing from."[7]  *Callas Enters., Inc. v. Travelers Indem. Co. of Am.*, 193 F.3d 952, 955–56 (8th Cir. 1999) (citation and internal quotation marks omitted) (applying Minnesota law); *see also Spirtas Co. v. Fed. Ins. Co.*, 521 F.3d 833, 835–36 (8th Cir. 2008) (applying Missouri law, explaining "arising from" in exclusion means "flowed from" or "had [its] origins in" (citation and internal quotation marks omitted)); *Allstate Ins. Co. v. Pierce*, 271 F. App'x 416, 417–18 (5th Cir. 2008) (applying Mississippi law, explaining "arising out of" in exclusion means "originating from, having its origin in, growing out of, or flowing from" (citation and internal quotation marks omitted)); *United Nat'l Ins. Co. v. Penuche's, Inc.*, 128 F.3d 28, 31 (1st Cir. 1997) (applying New Hampshire law, explaining phrase "arising out of" in exclusion "is a very broad term meaning originating from or growing out of or flowing from" but not "so broad as to encompass a 'tenuous' connection" (citation and internal quotation marks omitted)).

With these propositions in mind, we examine the language of the underwriting exclusion and the nature of the Smiths' claims.  Farm Bureau contends the language of the exclusion renders it inapplicable to the Smiths' claims because they were unrelated to the function of underwriting described in the policy.  Noting the language of the underwriting exclusion is not limited to claims based on Farm Bureau's failure to issue life insurance policies to the Smiths or the manner in which Farm Bureau decided against insuring the Smiths' lives, Holmes

---

[7]We acknowledge a phrase like "arising out of" may be given a narrower scope in an exclusion when a court finds the exclusion ambiguous and therefore determines the phrase means "proximately caused by."  *See Norwalk Ready Mixed Concrete, Inc. v. Travelers Ins. Cos.*, 246 F.3d 1132, 1138 (8th Cir. 2001).  As we explain, however, we find the plain meaning of the underwriting exclusion here unambiguous.

Murphy counters that the Smiths' claims clearly *arose from* Farm Bureau's underwriting activity.

The ICPL policy does not define "underwriting." The language of the underwriting exclusion itself is instructive nonetheless, exempting from coverage claims arising from, or in consequence of "the underwriting of insurance, including any decisions involving the classification, selection, or renewal of risks." As we have noted, we will not give undefined policy terms technical meanings. Instead, we give them their ordinary meanings and look to dictionaries and caselaw for guidance. *A.Y. McDonald*, 475 N.W.2d at 619. Farm Bureau offers several dictionary definitions of "underwriting," the most descriptive of which is "the process of examining, accepting or rejecting insurance risks, and classifying those selected in order to charge the proper premium for each." Harvey W. Rubin, *Barron's Dictionary of Insurance Terms* 551 (6th ed. 2013). Holmes Murphy notes, and we agree, that this dictionary definition is consistent with the express language of the exclusion at issue in this case and definitions applied by courts in other jurisdictions. *See, e.g., Mich. Millers Mut. Ins. Co. v. Fid. & Deposit Co. of Md.*, 809 F. Supp. 2d 703, 711 (W.D. Mich. 2011) (underwriting is "decision regarding which entities to insure"); *In re PMA Capital Corp. Sec. Litig.*, No. 03–6121, 2005 WL 1806503, at *2 (E.D. Pa. 2005) ("underwriting[] involves the identification and selection of risks and the determination of an adequate price of insuring those risks given the expected losses"); *Hosp. Corp. of Am. & Subsidiaries v. Comm'r of Internal Revenue*, 74 T.C.M. (CCH) 1020, 1997 WL 663283, at *2 (T.C. 1997) ("Underwriting is the selection and pricing of risks to be insured."); Thomas C. Cady & Georgia Lee Gates, *Post Claim Underwriting*, 102 W. Va. L. Rev. 809, 812 (2000) (underwriting includes "a risk assessment

conducted[] pre-issuance and pre-loss").  *But cf. Vincent v. Safeco Ins. Co. of Am.*, 29 P.3d 943, 945 (Idaho 2001) ("Underwriting is . . . the process by which insurance companies determine whether the risk assumed is worth the premium received."); *Black's Law Dictionary* 1665 (9th ed. 2009) (Underwriting is "[t]he act of assuming a risk by insuring it; the insurance of life or property.").

Insurers typically ask questions regarding an applicant's medical background as part of the underwriting process of determining which persons or risks to insure.  U.S. Congress Office of Tech. Assessment, *Aids and Health Insurance: An OTA Survey*, Leaflet No. 2, at 1 (1988).  They may gather records regarding an applicant's past and current medical condition from an attending physician.  *Id.*  They may even require an applicant undergo physical examination and medical testing.  *Id.*  Using all this information, insurers engaged in the underwriting process will determine not only whether to insure an applicant, but will also determine the applicable premiums in any given case and may try to limit potential costs and liabilities.  *Id.* at 2.

Despite this common understanding of underwriting and its associated activities, Farm Bureau contends an appropriate construction of the underwriting exclusion cannot defeat coverage for the Smiths' claims because they were "factually distinct" from claims that would arise from the underwriting of insurance.  In other words, Farm Bureau explains, the Tenth Circuit never suggested the Smiths' claims were for Farm Bureau's violation of a duty in its decision not to issue life insurance policies, and thus, the claims could not have arisen from underwriting.  Holmes Murphy counters the district court correctly concluded the Smiths' claims "involved the failure of Farm Bureau, a life insurance company, to properly notify an applicant for life insurance of

the results of the life insurance underwriting." Further, Holmes Murphy contends, the exclusion is not narrowly limited to claims for failure to issue a policy or claims regarding the manner in which a decision has been reached, but instead expressly extends more broadly to claims "arising from" underwriting activities.

Given the ordinary definition of underwriting and its associated activities, we cannot conclude Farm Bureau's eligibility investigation and management of information derived from it were outside the scope of the underwriting exclusion here. We acknowledge that when viewed in isolation, a procedure for extraction and examination of blood might not, by itself, constitute underwriting activity. Nevertheless, we are tasked here—according to the plain language of the policy and the exclusion— with determining whether the Smiths' claims arose out of Farm Bureau's alleged breach of a duty, and whether that duty arose from or was in consequence of Farm Bureau's underwriting activity. The Tenth Circuit's analysis of the Smiths' claims, when examined in conjunction with the ordinary definition of underwriting, aids us in answering both inquiries.

The basis for the viability of the Smiths' claims under Wyoming law, according to the Tenth Circuit, is Farm Bureau's affirmative duty to disclose sufficient information to its applicant in the event Farm Bureau discovers in the course of its eligibility investigation the applicant is HIV positive. *Pehle*, 397 F.3d at 903. That duty arose in this case because of the nature of Farm Bureau's relationship with the Smiths. The Farm Bureau–Smith relationships were special, explained the Tenth Circuit, because Farm Bureau had encouraged the Smiths' purchases of the life insurance policies, elicited their further trust by subjecting them to the blood extraction and investigation, and as a result possessed information of vital importance to the Smiths' health and safety. *Id.* Having

considered these circumstances, the Tenth Circuit concluded the affirmative duty will arise "if an insurance company, through independent investigation by it or a third party for purposes of determining policy eligibility, discovers that an applicant is infected with HIV." *Id.* In other words, the Tenth Circuit concluded both Farm Bureau's duty to reveal the information and the Smiths' claims arose out of the activities Farm Bureau undertook to determine the Smiths' eligibility for insurance. That conclusion is instructive here. Farm Bureau's duty arose from its routine eligibility investigation, including analysis of the applicants' blood. *Id.* at 899. We think the Smiths' claims, therefore, fall squarely within the range of claims contemplated by the underwriting exclusion.

Two additional pieces of intrinsic evidence from the ICPL policy bolster the conclusion that the underwriting exclusion precluded coverage for the acts or omissions forming the basis of the Smiths' claims against Farm Bureau. Farm Bureau's investigation and determination of policy eligibility are fairly characterized as aspects of its classification and selection of risk, which are specifically enumerated in the language of the underwriting exclusion. We are not persuaded by Farm Bureau's contention that the claim here is not for identification of or failure to identify a risk, but for failure to notify.[8] Farm Bureau's failure to notify was actionable only if a duty to reveal the information was owed. The duty recognized by the Tenth Circuit arose because of the nature of the

---

[8]Farm Bureau's reliance on a Texas case involving an insured party not engaged in the practice of underwriting for the proposition that the claim here does not arise out of underwriting activity is unavailing. *See HCC Empl'r Servs., Inc. v. Westchester Cnty. Surplus Lines Ins. Co.*, No. H-05-1275, 2006 WL 1663343, at *5 (S.D. Tex. 2006) (holding negligent failure to notify regulatory body of lapse of insurance policy did not arise out of underwriting of insurance). Indeed, that court hinted its analysis may have been different had the insured party done the underwriting that gave rise to the claim. *Id.*

special relationship between the parties. The special relationship arose as a result of Farm Bureau's policy eligibility investigation and the information it derived from the investigation. *Id.* at 903 (noting insurance companies need not exist to treat or diagnose HIV for the duty to arise).

The policy's definition of "insurance services," from which any claim covered by the policy must arise, further supports the conclusion the underwriting exclusion precludes coverage for the Smiths' claims against Farm Bureau. Insurance services are defined as only those services rendered in the conduct of "claims handling and adjusting, insurance risk management; safety engineering; inspection and loss control operations; personal injury rehabilitation operations; salvage operations; recovery subrogation services; premium financing operations; actuarial consulting services; or insurance pool management" and did not include "medical or health care services" or other enumerated professional services. Farm Bureau's contention that the duty and claims here relate "only to notification of medical test results" neglects both the policy's "insurance services" prerequisite for coverage and the policy's express exclusion of medical services from the definition of insurance services.

We conclude under the facts here and the express provisions of the ICPL policy that the duty recognized by the Tenth Circuit and the Smiths' resulting claims arose out of Farm Bureau's underwriting activity.[9] The

---

[9]Farm Bureau suggests the Tenth Circuit's justification for finding the affirmative duty to notify—namely, the trust and confidence the Smiths reposed in Farm Bureau—precludes us from determining the Smiths' claims arose out of Farm Bureau's underwriting activity. We disagree. If indeed there were relationships of trust and confidence here, we think it reasonable to conclude they were a consequence of Farm Bureau's eligibility investigation activity, which was "underwriting" activity under the ordinary meaning of the word. That trust and confidence may arise in relationships

underwriting exclusion therefore precludes coverage for damages claimed by the Smiths against Farm Bureau.

Finally, we note Farm Bureau further contends the underwriting injury exclusion will, if given its literal, ordinary meaning, render the ICPL policy illusory. *Cf. First Newton Nat'l Bank*, 426 N.W.2d at 629 (giving policy terms their literal, ordinary meaning and noting that an alternate construction "would rob the insured of the very coverage he assumed he was getting" (citation and internal quotation marks omitted)). Holmes Murphy disputes this contention, arguing that coverage remains for (1) the vast majority of all claims for wrongful conduct that might arise from the performance of insurance services, and (2) most, if not all claims that might arise from the performance of, or failure to perform, financial services (which are covered by the second coverage clause in the policy). More specifically, Holmes Murphy explains that coverage for retirement planning and investment services, covered by the financial services clause, would not be precluded by the underwriting exclusion. We take no position regarding the application of the policy's various exclusions to scenarios not presented in this appeal, but note that Holmes Murphy has identified a specific group of claims that may be covered by the ICPL policy here. *See Vincent*, 29 P.3d at 948 (explaining if an identifiable group may collect on a policy, insurance is not illusory). We are not persuaded the ICPL coverage is so narrowed by the exclusions as to be illusory. Moreover, we are bound to decide coverage questions in view of the ICPL policy's provisions and the allegations of the Smiths' complaint against Farm Bureau. *See Stover v. State Farm Mut. Ins. Co.*, 189 N.W.2d 588, 592 (Iowa 1971). The terms of

---

outside the insurance context does not change the nature of their origin in the circumstances here.

the underwriting exclusion are unambiguous. We will not add to or subtract from the parties' contract based on public policy considerations in the absence of legislative, regulatory, or prior judicial statement of those considerations. *Am. Family Mut. Ins. Co.*, 697 N.W.2d at 117.

## IV. Conclusion.

The district court correctly concluded the ICPL policy's underwriting exclusion would have precluded coverage for the Smiths' claims even if Federal had been timely notified under the policy's notice requirement. Accordingly, we affirm the district court's summary judgment in favor of Holmes Murphy.

**AFFIRMED**.