# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-2739

_____

Amera-Seiki Corporation

*Plaintiff - Appellee*

v.

The Cincinnati Insurance Company

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: April 9, 2013
Filed: July 23, 2013

_____

Before RILEY, Chief Judge, BYE and BENTON, Circuit Judges.

_____

RILEY, Chief Judge.

In this diversity case, see 28 U.S.C. § 1332(a)(1), The Cincinnati Insurance Company (Cincinnati) appeals the district court's[1] adverse summary judgment rulings in Cincinnati's insurance coverage dispute with policyholder Amera-Seiki

_____

[1]The Honorable Edward J. McManus, United States District Judge for the Northern District of Iowa.

Corporation (Amera-Seiki).  Cincinnati also appeals the district court's award of prejudgment interest under Iowa law.  Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

Amera-Seiki, an Iowa corporation with its principal place of business in Iowa, imports computerized industrial equipment for customers in the United States.  In 2009, Amera-Seiki purchased a commercial property policy from Cincinnati, an Ohio corporation with its principal place of business in Ohio.  The policy, which was effective November 5, 2009 to December 31, 2010, extended coverage to certain "Newly Acquired or Constructed Property" as follows:

> **(2)    Business Personal Property**
>
> (a)    If this policy provides coverage under **SECTION A. COVERAGE, 1.  Covered Property, d. Business Personal Property**, you may extend that insurance to apply to "loss" to:
>
> 1)    Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions.

During the policy period, Amera-Seiki purchased a vertical lathe from a manufacturer in Taiwan for delivery to a customer in Illinois.  Amera-Seiki paid in full for the lathe on May 13, 2010, and the lathe shipped from Taiwan on June 3, 2010.  Amera-Seiki retained Leader International Express Corporation to arrange to transport the lathe by ship to Los Angeles, California, and to store the lathe until a flatbed truck could transport it to Illinois.  The lathe arrived at the APL Container Terminal/Global Gateway South Terminal (terminal) at the Port of Los Angeles in Terminal Island, California, on or about June 29, 2010.  The terminal is owned by the

Port of Los Angeles and operated by Eagle Marine Services, Ltd. (Eagle) under an exclusive lease. The terminal is a secure, fenced facility, and access is prohibited without proper identification, a legitimate business purpose, and an escort from Eagle.

Amera-Seiki paid $1,950 to store the lathe at the terminal from July 8, 2010 to July 13, 2010.[2] On July 13, 2010, a longshore worker at the terminal was moving the lathe by yard tractor to the location where the delivery driver could pick it up when the lathe fell, destroying the lathe. Amera-Seiki filed a claim with Cincinnati for the total loss. Cincinnati denied most of Amera-Seiki's claim, advising Amera-Seiki the coverage extension for newly acquired property did not apply. Cincinnati determined the policy provided only $10,000 of transportation coverage and paid that amount.

On December 8, 2010, Amera-Seiki sued Cincinnati in Iowa state court, alleging breach of contract. On December 21, 2010, Cincinnati removed the case to the Northern District of Iowa based upon diversity jurisdiction. See 28 U.S.C. §§ 1332(a)(1) and (c), 1441, 1446. After discovery, Amera-Seiki and Cincinnati filed cross-motions for summary judgment.

On March 16, 2012, the district court denied Cincinnati's motion and granted summary judgment to Amera-Seiki. The district court determined Amera-Seiki's "temporary acquisition of the location at the [terminal]" constituted a location Amera-Seiki acquired within the meaning of the newly acquired property extension in the Cincinnati policy. The district court also decided "the reference to 'location you acquire' in the policy provision [was] ambiguous." The district court ordered the parties "to file a joint statement advising whether" any issues remained "or whether the matter [was] ripe for judgment."

---

[2]Amera-Seiki paid this fee to Leader, which in turn paid Eagle. Cincinnati admits "Amera-Seiki utilized [Leader's] services . . . for purposes of arranging for . . . the storage of the [lathe] while it was located in Los Angeles" and "storage was arranged for at the [terminal]."

On April 4, 2012, the parties stipulated the amount of the loss was $337,025.50, but advised the district court the parties disagreed whether Iowa law required Cincinnati to pay prejudgment interest on that amount. After considering the parties' respective positions, the district court awarded prejudgment interest under Iowa Code § 535.2(1)(b), which provides for interest on "[m]oney after the same becomes due." Cincinnati appeals the judgment and the award of prejudgment interest.

## II. DISCUSSION

### A. Standards of Review and Applicable Law

We review de novo "the district court's interpretation of the terms of the insurance policy and its" summary judgment decisions. Corn Plus Coop. v. Cont'l Cas. Co., 516 F.3d 674, 678 (8th Cir. 2008). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Whether the district court properly awarded prejudgment interest in this diversity case is a question of state substantive law that we review de novo. See Weitz Co. v. MH Washington, 631 F.3d 510, 528 (8th Cir. 2011); Emmenegger v. Bull Moose Tube Co., 324 F.3d 616, 624 (8th Cir. 2003). The parties agree Iowa substantive law applies to this appeal. See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). "We must predict how the [Iowa Supreme Court] would rule, and we follow decisions of the intermediate state court when they are the best evidence of [Iowa] law." Friedberg v. Chubb & Son, Inc., 691 F.3d 948, 951 (8th Cir. 2012).

### B. Newly Acquired Property

The primary issue in this appeal is whether the terminal where the lathe fell constitutes a location Amera-Seiki acquired within the meaning of the newly acquired property coverage extension. Because the policy does not define the term "acquire" and the parties do not agree as to its meaning as applied to this case, we must "give

meaning to [the term as used] in the policy." Boelman v. Grinnell Mut. Reins. Co., 826 N.W.2d 494, 501 (Iowa 2013). "[W]e interpret the policy language from a reasonable rather than a hypertechnical viewpoint," giving undefined words their "ordinary meaning." Id. at 501-02. "The plain meaning of the insurance contract generally prevails." Id. at 501. "We will not strain the words or phrases of the policy in order to find liability that the policy did not intend and the insured did not purchase." Id.

"Under an objective test, a policy is ambiguous if the language is susceptible to two *reasonable* interpretations. We read the policy as a whole when determining whether the contract has two equally plausible interpretations, not seriatim by clauses." Id. (internal citation omitted). "If the policy is ambiguous, we adopt the construction most favorable to the insured. . . . An insurance policy is not ambiguous, however, just because the parties disagree as to the meaning of its terms." Id. at 502. As the insured party, Amera-Seiki bears the burden of establishing its "right to recover under the terms of the policy." Messer v. Wash. Nat'l Ins. Co., 11 N.W.2d 727, 730 (Iowa 1943).

Applying these principles to the parties' respective interpretations of the newly acquired property extension, we agree with the district court that the extension, read in context, is ambiguous and must be construed in favor of Amera-Seiki. See Boelman, 826 N.W.2d at 502. We begin with the Iowa Supreme Court's recognition that the term "acquire" generally "has a broad meaning. . . . defined in the dictionary, for example, as 'to come into possession, control, or power of disposal of often by some uncertain or unspecified means,'" including finding abandoned property. Sullivan Graphics, Inc. v. Bd. of Review of Cnty. of Iowa, 533 N.W.2d 213, 215 (Iowa 1995) (quoting Webster's Third New International Dictionary 18 (1986)).

Narrowly construing this broad definition and several similar dictionary definitions, see, e.g., Black's Law Dictionary 26 (9th ed. 2009) (defining "acquire"

as "[t]o gain possession or control of; to get or obtain"), Cincinnati contends "Amera-Seiki did not 'acquire' the [terminal] under the plain and ordinary definition of 'acquire'" because Amera-Seiki did not own, lease, possess, or exercise "any element of control, authority, or decision-making ability for the terminal." According to Cincinnati, Amera-Seiki's temporary storage arrangements at the terminal were too passive and too transient to qualify the terminal as a location Amera-Seiki had acquired under any reasonable interpretation of the newly acquired property extension.[3]

Amera-Seiki applies the same definitions from Sullivan Graphics and Black's Law Dictionary as Cincinnati, but urges a far broader interpretation. Describing "acquire" as "an extremely broad term including to get or obtain in any way," Amera-Seiki asserts Cincinnati is unable "to demonstrate that acquire is susceptible only to the more limited interpretation [Cincinnati] suggests." In Amera-Seiki's view, if Cincinnati intended to require greater permanency, ownership, possession, or control than Amera-Seiki's "lease of storage space" at the terminal provided, Cincinnati should have defined the term "acquire" in the policy or otherwise expressly limited the newly acquired property extension in the same way Cincinnati limited other policy provisions.

In support, Amera-Seiki relies on Huddleston v. United States, 415 U.S. 814 (1974), in which the Supreme Court cautioned against "enshrouding" the term "acquisition" in a criminal firearms statute "with an extra-statutory 'legal title' or 'ownership' analysis" because "[t]he word 'acquire' is defined to mean simply 'to

_____

[3]On appeal, Cincinnati never argued that Amera-Seiki's use of an intermediary, Leader, affected Amera-Seiki's rights under the policy. We do not address whether the policy, by referring to "any location *you* acquire" (emphasis added), limited coverage to locations directly acquired by the insured, because Cincinnati "has waived any [such] argument." Harleysville Ins. Co. v. Physical Distrib. Servs., Inc., 716 F.3d 451, 460 n.11 (8th Cir. 2013).

come into possession, control, or power of disposal of.'" Id. at 820 (quoting Webster's Third New International Dictionary (1966)). Echoing that same caution here, Amera-Seiki maintains it sufficiently got, obtained, possessed, and controlled—and thus acquired—the location at the terminal where the lathe was damaged when Amera-Seiki paid $1,950 for the right to store the lathe "at a specific fenced and secured property" "for a specified time" under an agreement Amera-Seiki describes as a "lease."

Amera-Seiki finds additional support for its broader interpretation of the newly acquired property extension in the qualifying phrase "other than at fairs, trade shows or exhibitions." To blunt Cincinnati's criticism that Amera-Seiki's limited rights at the terminal were too passive and too transient to fall within the coverage extension, Amera-Seiki insists the district court correctly determined "there exists no substantive distinction between the degree of possessory interest, dominion, or control with regard to the temporary acquisition of a location at a 'fair, trade show, or exhibition,' and [Amera-Seiki's] temporary acquisition of the location at the [terminal]." The district court reasoned that "[t]he former is expressly excluded, and the latter is not within the express exclusion, and therefore the latter is within the coverage of the policy." Amera-Seiki proposes the "common characteristics" of fairs, trade shows, and exhibitions and Amera-Seiki's temporary storage arrangements at the terminal—including the lack of ownership and the absence of any exclusive "right to direct, command, regulate, manage, or control the facility as a whole,"—"clearly demonstrate that the [terminal] must fall within the meaning of 'location you acquire.'"

Although we are not persuaded the newly acquired property extension unambiguously extended coverage to the terminal, we agree with the district court that the phrase "any location you acquire" is "objectively susceptible to the reasonable interpretation pressed by [Amera-Seiki] and consistent with the ordinary meaning of those words." At the same time, the policy is also objectively susceptible

to Cincinnati's reasonable interpretation that the ordinary meaning of the phrase requires a greater level of possession and control than Amera-Seiki had at the terminal as a result of its brief storage of the lathe during transport from Taiwan.

Cincinnati and Amera-Seiki simply emphasize different aspects of the same broad definitions of "acquire," with neither gaining any definitive claim to the ordinary or plain meaning of the term. To be sure, each proffered policy interpretation suffers its own flaws and both fray at the edges, but given the breadth of the policy language, neither is unreasonable. See Boelman, 826 N.W.2d at 501. "'Ambiguity exists if, after the application of pertinent rules of interpretation to the policy, a genuine uncertainty results as to which one of two or more meanings is the proper one.'" Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Farmland Mut. Ins. Co., 568 N.W.2d 815, 818 (Iowa 1997) (quoting A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am., 475 N.W.2d 607, 618 (Iowa 1991)). The extension of coverage to "any location you acquire" is ambiguous. Because Iowa law requires us to construe that ambiguity in Amera-Seiki's favor, the district court's judgment was correct. See id.

### C.   Prejudgment Interest

Cincinnati challenges the district court's award of prejudgment interest, arguing "when damages are undetermined prejudgment interest is calculated from the date of judgment." Cincinnati asserts "the calculation of prejudgment interest should accrue from March 16, 2012"—the date the district court "resolved the coverage dispute and determined, with certainty, the coverage amount of $337,025.50." Cincinnati's assertion is contrary to Iowa law.

Under Iowa law, "in many instances interest is not recoverable on unliquidated damages prior to judgment." Gosch v. Juelfs, 701 N.W.2d 90, 92 (Iowa 2005). Interest generally "'runs from the time money becomes due and payable, and in the case of unliquidated claims this is the date they become liquidated, ordinarily the date

of judgment.'" Schimmelpfennig v. Eagle Nat'l Assur. Corp., 641 N.W.2d 814, 816 (Iowa 2002) (per curiam) (quoting Midwest Mgmt. Corp. v. Stephens, 353 N.W.2d 76, 83 (Iowa 1984)). "In Iowa, however, an exception exists to the unliquidated claim rule when the damage is complete at a particular time. Then interest runs from that time although the damage has not been fixed in a specific sum." Lemrick v. Grinnell Mut. Reins. Co., 263 N.W.2d 714, 720 (Iowa 1978).

"'When, as here, a definite amount of recovery has been fixed by [joint stipulation] for a damage item shown to be complete at a particular time, interest should be allowed as to that item from the time that the damage was shown to be complete.'" Gosch, 701 N.W.2d at 92-93 (determining a tortfeasor who damaged the plaintiff's truck owed prejudgment interest from the date of loss, not the date the action commenced because the damage to the truck was complete on the date of loss); see also FC Coop II v. Iowa Select Farms, L.P., 759 N.W.2d 812, 2008 WL 4724856, at *4 (Iowa Ct. App. 2008) (unpublished table decision) ("The joint stipulation of the parties provides the necessary proof 'the entire damage for which recovery is demanded was complete at a definite time before the action was begun.'" (emphasis omitted) (quoting Gosch, 701 N.W.2d at 92)). Relying on Gosch, the district court concluded "the entire damage for which" Amera-Seiki demanded coverage was complete when the lathe was destroyed on "July 13, 2010, and therefore [Amera-Seiki was] entitled to interest on the damage from that date."

Cincinnati claims the award of prejudgment interest from the date of loss was in error because Cincinnati disputed Amera-Seiki's right to recover the full value of the lathe under the policy until the district court awarded Amera-Seiki judgment. This claim is without merit. Cincinnati's brief argument on this point is essentially a restatement of the general rule for unliquidated damages. But Cincinnati completely ignores Iowa's long-recognized exception for cases like this, "'in which the entire damage for which recovery is demanded was complete at a definite time before the action was begun,'" even though the precise amount of those damages is

fixed at a later time. <u>Gosch</u>, 701 N.W.2d at 92 (emphasis omitted) (quoting <u>Bridenstine v. Iowa City Elec. Ry.</u>, 165 N.W. 435, 439 (Iowa 1917) <u>overruled in part on other grounds by</u> <u>Menke v. Peterschmidt</u>, 69 N.W.2d 65, 69 (Iowa 1955)). Cincinnati never mentions the exception to the unliquidated claim rule or the district court's analysis of <u>Gosch</u> and makes no effort to refute the district court's sound application of the exception to the July 13, 2010 total loss to the lathe. The district court did not err in awarding prejudgment interest under Iowa law.

## III.    CONCLUSION

We affirm the judgment and the award of prejudgment interest.

_____