THE PHOENIX INSURANCE COMPANY, Plaintiff,

v.

INFOGROUP, INC., Defendant.

No. 1:13–cv–00005–JAJ–CFB

United States District Court, S.D. Iowa, Western Division.

Signed November 30, 2015

Benjamin Michael Weston, Lederer Weston Craig PLC, West Des Moines, IA, J. Michael Weston, Lederer Weston Craig PLC, Cedar Rapids, IA, Eric J. Shukis, Kirk M. Zapp, Matthew S. Ponzi, Foran Glennon Palandech Ponzi & Rudloff PC, Chicago, IL, for Plaintiff.

Jill Robb Ackerman, Heidi A. Guttau-Fox, Baird Holm LLP, Omaha, NE, Daniel H. Rylaarsdam, Mary Craig Calkins, Kilpatrick Townsend & Stockton LLP, Beverly Hills, CA, Eric Matthew Gold, Kilpatrick Townsend & Stockton LLP, Washington, DC, for Defendant.

## ORDER

JOHN A. JARVEY, Chief Judge

In June 2011, Defendant Infogroup, Inc., relocated its business due to a threat of flooding posed by the nearby Missouri river. Infogroup is a data provider, meaning Infogroup provides comprehensive verified and customized databases, stored and utilized on Infogroup's servers, to internet companies and other businesses to support sales, marketing, and information services. Defendant submitted a claim to its insurance provider, Plaintiff, The Phoenix Insurance Company, seeking compensation for its relocation costs and associated expenses. After initially providing Defendant with an advance to cover expenses, Plaintiff determined that Defendant's claimed expenses were not fully covered under its insurance policy, and filed a petition in this Court seeking declaratory relief and restitution, requesting return of the money it overpaid for Defendant's expenses.

This matter comes before the Court pursuant to the parties' March 13, 2015, cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Both parties filed response briefs on April 10, 2015, and final reply briefs in support of their respective motions for summary judgment on May 15, 2015. The Court held oral argument on the parties' cross motions for summary judgment on August 20, 2015.[1] Both motions for summary judgment focus whether Defendant suffered any physical damage, and whether the threat of flooding or loss of use was sufficient to trigger coverage under the relevant insurance policy provisions.

## I. STATEMENT OF UNDISPUTED MATERIAL FACTS

Except as noted below, Court finds the following undisputed facts: Plaintiff, Phoenix Insurance Company, insured Defendant, Infogroup, Inc.'s business buildings and relevant personal business property, including Defendant's data and data processing equipment, between March 22, 2011, and March 22, 2012. Defendant's insurance policy through Plaintiff contains three key provisions: the "Extra Expense" clause, the "Preservation of Property" clause, and the "Protection of Property" clause. The policy also contains a "Data Endorsement."

---

1. On November 11, 2015, Plaintiff filed a notice of supplemental authority. Defendant filed objections to that authority on November 17, 2015, claiming the additional authority should be disregarded as irrelevant and contrary to law.

The Extra Expense provision reads, in relevant part:

*3. Additional Coverages—Unless otherwise indicated in the Declarations, the following Additional Coverages apply:*

　*a. Extra Expense*

*Extra expense means reasonable and necessary expenses you incur during the "period of restoration"[2] that you would not have incurred if·there had been no direct physical loss of or damage to property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss.*

　*(1) We will pay your Extra Expense to avoid or minimize the suspension of business and to continue "operations":*

*a. At the described premises; or*

*b. At replacement premises or temporary locations, including*

*i. Relocation expenses;*

*ii. Costs to equip and operate the replacement premises or temporary locations; and*

*iii. Expediting expenses.*

The Preservation of Property clause reads, in relevant part:

*4. Additional Coverages—Unless otherwise indicated in the Declarations,·the following Additional Coverages apply:*

　*[ . . . ]*

　*c. Preservation of Property*

*If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for:*

*1) Any direct physical loss or damage to this property . . .*

　*[ . . . ]*

*2) The cost to remove the property from the described premises.*

*Coverage will end when any of the following first occurs:*

　*1) When the policy is amended to provide insurance at the new location;*

　*2) The property is returned to the original location; or*

　*3) This policy expires.*

The Protection of Property clause reads, in relevant part:

*F. Loss Conditions*

　*[ . . . ]*

*3. Duties in the Event of Loss or Damage*

　*a. You must see that the following are done in the event of loss of or damage to Covered Property:*

　　*[ . . . ]*

　*(5) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim.*

　　*[ . . . ]*

*4. Loss Payment*

　*a. In the event of loss or damage covered by this coverage form, at our option, we will [reimburse costs in one of various ways].*

The Data Endorsement reads, in relevant part, as follows:

*A. Changes to the Deluxe Property Coverage Form*

*The insurance coverage provided under the Deluxe Property Coverage Form for direct physical loss or damage to Your Business Personal Property and Personal Property of Others applies to direct physical loss or damage to 'Electronic Data Processing Equipment' and 'Electronic Data*

---

**2.** Terms in quotation marks within the policy are defined elsewhere in the policy.

*Processing Data and Media' [subject to certain limitations].*

Defendant's policy insured three properties in Carter Lake, Iowa, including two data centers and a combination office and warehouse, and the personal business property contained at each property. The Carter Lake properties were located near the Missouri River. In late May, 2011, the Army Corps of Engineers issued several news releases warning of the Missouri River's high water levels and potential flooding. On or about June 1, 2011, Defendant decided to move and relocate its business operations and data centers away due to the threat of flooding, and, as of that time, did not intend to return to the Carter Lake facilities. On June 1, 2011, Defendant contacted its insurance broker, Aon Risk Solutions ("Aon") to communicate with Plaintiff about the move. On July 19, 2011, after Defendant had already begun moving, Plaintiff advanced $500,000 to Defendant for anticipated claims under the Preservation of Property and Claim Data Expense [3] provisions of the policy. Plaintiff claims that it maintained throughout its communications with Defendant that the policy would cover only the costs to move covered property to preserve it from flood damage, but would not include the costs to establish a new operating facility.

On August 22, 2011, heavy rain left surface water in the parking lot at the Carter Lake facilities. The parties dispute whether this water caused any physical loss or damage and whether the water entered any of the Carter Lake buildings. Defendant also claims to have suffered other relatively minor property damage during July and August, 2011, including damage to an uninterruptable power source and damage to a server. Plaintiff disputes whether this harm occurred, but agrees Defendant's parking lot was flooded for the period of one day. The threat of flood from the Missouri River ended in October, 2011, if not before. On October 21, 2011, Defendant, through Aon, submitted a claim in the gross amount of $9,524,260 ($8,974,260 net after subtracting Defendant's $50,000 deductible and the $500,000 advance), requesting payment pursuant to the Preservation of Property clause. [Dkt. 64–6 PP. 4, 10]. Plaintiff responded that it would not reimburse Plaintiff's business income loss or costs to re-establish business under the Extra Expense clause because there was no direct physical loss or damage.

On May 16, 2012, Aon submitted an updated claim submission, modifying its October 21, 2011, claim submission. This addendum requested payment of $12,190,614 ($11,640,614 after subtracting Defendant's $50,000 deductible and the $500,000 advance). This claim submission was for a larger amount because it included 18 moths of co-location rent at Defendant's new location. Plaintiff responded that it did not agree that the entirety of Defendant's claimed expenses were covered under the policy, and instead concluded that Defendant's covered expenses totaled less than the $500,000 advance. The parties agree that Plaintiff's position on coverage under the policy, as originally articulated in early June, 2011, never changed during the adjustment of the claim and remained consistent throughout. Defendant's Resistance [Dkt. 72–1 P. 68].

Plaintiff filed a complaint on February 20, 2013, seeking declaratory judgment

---

**3.** The policy's "Claim Data Expense" provision covers some of the costs incurred in preparing an insurance claim, and reads, in part: "You may extend the Insurance provided by this Coverage Form to apply to the reasonable expenses you incur in preparing claim data when we require it. This includes the cost of taking inventories, making appraisals and preparing other documentation to show the extent of loss." [Dkt. 64–3 P. 24].

that the Defendant is not entitled to coverage under the Extra Expense coverage because the Carter Lake locations sustained no direct physical damage, that the Preservation of Property clause covers only $251,514.19, and that Plaintiff owes Defendant no further coverage. Plaintiff also to recoup the difference between its $500,000 advance and the amount it argues it allegedly owed Defendant: $248,458.81. Defendant filed a counterclaim on April 22, 2013, claiming Plaintiff breached its contract with Defendant, that Plaintiff breached the implied covenant of good faith and fair dealing, and seeking declaratory judgment that Plaintiff must honor the policy as Defendant interprets it. Both parties filed motions for summary judgment on March 13, 2015.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Kountze ex rel. Hitchcock Found. v. Gaines,* 536 F.3d 813, 817 (8th Cir.2008) ("[S]ummary judgment is appropriate where the pleadings, discovery materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law."); *Farm Bureau Life Ins. v. Holmes Murphy,* 831 N.W.2d 129 (Iowa 2013). In making this determination, the Court must examine the evidence in the light most favorable to the nonmoving party. *See HDC Med., Inc. v. Minntech Corp.,* 474 F.3d 543, 546 (8th Cir.2007).

To survive a motion for summary judgment, a party must "set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). "[A]n issue of material fact is genuine if the evidence is sufficient to

allow a reasonable jury verdict for the nonmoving party." *Great Plains Real Estate Dev., LLC v. Union Cent. Life Ins. et al.,* 536 F.3d 939, 944 (8th Cir.2008) (citation omitted). "A genuine issue of fact is material if it 'might affect the outcome of the suit under the governing law.'" *Saffels v. Rice,* 40 F.3d 1546, 1550 (8th Cir. 1994) (citation omitted). "'[T]he substantive law will identify which facts are material.'" *Guinan v. Boehringer Ingelheim Vetmedica, Inc.,* 803 F.Supp.2d 984, 993 (N.D.Iowa 2011) *(quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "The mere existence of a scintilla of evidence in support of [a party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## III. ANALYSIS

The Court construes the meaning and legal effect of an insurance policy as a matter of law. *See A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.,* 475 N.W.2d 607, 618 (Iowa 1991). Determination of the meaning of any specific "policy term, where such interpretation is not dependent on extrinsic evidence, is a question of law for the court." *Milligan v. Grinnell Mut. Reins. Co.,* 2001 WL 427642, at *2 (Iowa Ct.App. April 27, 2001) *(citing A.Y. McDonald,* 475 N.W.2d at 618). "Because insurance policies are in the nature of adhesive contracts," Iowa law generally requires courts to "construe their provisions in a light favorable to the insured." *A.Y. McDonald,* 475 N.W.2d at 619.

"The controlling consideration in construction of insurance policies is the intent of the parties." *Farm Bureau Life Ins.,* 831 N.W.2d at 133 (Iowa 2013) *(citing Thomas v. Progressive Cas. Ins. Co.,* 749

N.W.2d 678, 681 (Iowa 2008)). The Court determines intent by examining the words of the policy itself, except when the policy is ambiguous. *Id.* (*citing A.Y. McDonald,* 475 N.W.2d at 618). When a word used in a policy is not defined within the policy, the Court interprets the policy language from a "reasonable rather than hyper technical viewpoint" and assigns undefined words their "ordinary meaning." *Amera–Seiki Corp. v. Cincinnati Ins. Co.,* 721 F.3d 582, 585 (8th Cir.2013) (*citing Boelman v. Grinnell Mut. Reins. Co.,* 826 N.W.2d 494, 501–02 (Iowa 2013)). The Court interprets undefined words in the context of the policy as a whole, and avoids interpreting the policy in such a way as to render parts of a contract "surplusage." *See Fashion Fabrics of Iowa, Inc. v. Retail Inv'rs Corp.,* 266 N.W.2d 22, 26 (Iowa 1978) (*citing* RESTATEMENT (2D) OF CONTRACTS § 229) ("Because an agreement is to be interpreted as a whole, it is assumed in the first instance that no part of it is superfluous; an interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."). Courts commonly rely on dictionaries in arriving at the ordinary meaning of a term as it would be understood by a reasonable person. *Farm Bureau Life Ins.,* 831 N.W.2d at 133 (citation omitted).

When a term is ambiguous, the Court may look beyond the words of the policy in an attempt to decipher its meaning. "A contract is ambiguous when its terms are 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *United Airlines v. Ins. Co. of the State of Pa.,* 385 F.Supp.2d 343, 347 (S.D.N.Y.2005) (citation omitted). "Mere disagreement, however, as to the meaning of the terms, does not establish ambiguity." *Farm Bureau Life Ins.,* 831 N.W.2d at 133 (*citing A.Y. McDonald,* 475 N.W.2d at 619). The Court instead examines "whether the policy language, viewed objectively, is fairly susceptible to two interpretations." *Id.* (*citing A.Y. McDonald,* 475 N.W.2d at 619). The Court reads the policy in its entirety and "refrains from straining the meaning of words and phrases of the policy to avoid imposing liability that was not intended and coverage that was not purchased." *Id.* (*citing Thomas,* 749 N.W.2d at 682). Language is unambiguous and may support a grant of summary judgment "when it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference in opinion." *United Airlines,* 385 F.Supp.2d at 347 (internal quotation marks omitted) (citation omitted). "If the contract is unambiguous, the Court is 'required to give effect to the contract as written.'" *Id.* (*citing K. Bell & Assocs., Inc. v. Lloyd's Underwriters,* 97 F.3d 632, 637 (2d Cir. 1996)).

The parties dispute whether Plaintiff must reimburse Defendant's claimed expenses under the Extra Expense clause, the Preservation of Property clause, the Protection of Property clause, and the common law. The Court addresses each policy provision in turn before addressing the common law.

## 1. Extra Expense Clause

The parties dispute whether Defendant is eligible for reimbursement under the Extra Expense Clause. The Extra Expense Clause is found in the "Deluxe Business Income Coverage Form (And Extra Expense)" portion of the policy. [Dkt. 64–

3 P. 38–39]. This portion of the policy explains that the insurer

> will pay for the actual loss of Business Income [the insured] sustain[s] due to the necessary suspension of [the insured's] "operations" during the "period of restoration". The *suspension must be caused by direct physical loss of or damage to property* .... The loss or damage must be caused by or result from a Covered Cause of Loss."

[Dkt. 64–3 P. 38] (emphasis added). The Extra Expense Clause falls within this coverage provision and defines "Extra Expenses" as "reasonable and necessary expenses you incur during the 'period of restoration' *that you would not have incurred if there had been no direct physical loss of or damage to property* at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss." [Dkt. 64–3 P. 39] (emphasis added). It explains that, when direct physical loss occurs, the insurer will pay for, among other things, the costs to "continue 'operations'" [Dkt. 64–3 P. 38].

Reading the policy language as a whole, the policy is unambiguous in its requirement that an insured suffer "direct physical loss or damage" to trigger the Extra Expense Clause. *See United Airlines,* 385 F.Supp.2d at 348. In fact, Defendant implicitly agrees that physical loss is required to trigger coverage under this clause. [Dkt. 65–1 P. 18] ("The CL Facility and some equipment located there were damaged and suffered physical loss including loss of use, so coverage under the Extra Expense clause was also triggered."). Defendant, therefore, makes two arguments that it suffered direct physical loss or damage. First, Defendant argues that it suffered "loss of use" of the Carter Lake facility due to the threat of flooding, and that this loss constitutes direct physical damage under the Extra Expense Clause. Deft. Motion for Summary Judgment ("Deft.Motion") [Dkt. 65–1 P. 16–17].

Second, Defendant argues that it suffered physical loss at various times after June 1, 2011. In response, Plaintiff argues that Defendant did not, in fact, suffer loss of use of the Carter Lake facility, and that even if Defendant had lost use of the Carter Lake Facility, loss of use does not constitute "physical loss or damage." Plaintiff also argues that Defendant did not suffer physical loss, and that any alleged physical loss did not trigger Defendant's decision to move and did not create a "period of restoration." Because the phrase "direct physical loss" is not defined the in policy, the Court interprets this policy provision by first examining the language itself. *Amera–Seiki Corp.,* 721 F.3d at 585.

## A. Physical Loss

The dictionary defines "physical" as "having material existence: perceptible especially through the senses and subject to the laws of nature." MERRIAM-WEBSTER, *available at* http://www.merriam-webster.com/dictionary/physical. The common usage of physical in the context of a loss therefore means the loss of something material or perceptible on some level. This understanding comports with other courts interpreting what constitutes "physical loss" under similar insurance provisions. *See Milligan v. Grinnell Mut. Reins. Co.,* 2001 WL 427642, at *2 (Iowa Ct.App. April 27, 2001) (finding physical loss or damage unambiguously refers to "injury to or destruction of" insured's realty, and noting that "[t]his conclusion finds further support in the fact that the loss or destruction must be physical in nature"); *Universal Image Prod., Inc. v. Chubb Corp.,* 703 F.Supp.2d 705, 709 (E.D.Mich.2010) (finding no direct physical loss when insured failed to demonstrate any "structural or other tangible damage to the insured property," and instead relied on intangible harms such as strong odor and the pres-

ence of mold rendering the building in question useless); *United Airlines*, 385 F.Supp.3d at 347–48 (finding that reading "damage" to include both physical and nonphysical elements would render other clauses covering situations when "access to the Insured Locations is prohibited by" leads to nonphysical damage to the insured location superfluous); *cf. Newman Myers Kreines Gross Harris P.C. v. Great N. Ins. Co.*, 17 F.Supp.3d 323, 330 (S.D.N.Y.2014) (physical damage need not be "tangible, structural, or physical," but requires a physical element in the form of invasion by fumes or contamination of water, or a "palpable future risk of damage" leading to a reactionary protective action and distinguishing a *preemptive* decision to shut off power). Therefore, physical loss or damage generally requires some sort of physical invasion, however minor.

■ Defendant argues that loss of use as the result of the threat of flooding meets this requirement. The parties dispute whether Defendant lost use of the Carter Lake facilities. Defendant argues that "the threat or 'risk' of property damage caused the actual loss of use of the CL facility." Deft. Motion [Dkt. 65–1 P. 19]. Defendant admits that twenty-five employees—what it calls a "small business group"—and equipment such as printers remained at the Carter Lake facilities. Defendant further admits that "key internet servers" remained at the facility, and that they remained there "because there had not yet been time to complete the evacuation." Deft. Response to Pl. SUMF [Dkt. 72–1 ¶ 82]. These employees, equipment, and servers remained at the Carter Lake facilities until at least August 22, 2011, over two months after the threat of flooding caused Defendant to initiate the moving process. However, despite repeatedly arguing that its business operations depended in large part on maintaining servers in operating order so as to allow its customers to access data, and

admitting that "key internet servers" remained at the Carter Lake facility, Defendant confusingly denies that it lost use of the facility due to the threat of flood.

The Court cannot find that Defendant had lost use of the facility at the time it admits to still housing employees, equipment, and key internet servers remained at the facilities. In coming to this conclusion, the Court notes the important distinction between *actual* loss of use and *threatened* loss of use. Cases Defendant cites for the proposition that loss of use can constitute a physical loss all include some sort of actual precipitating physical even that renders the building in question unusable. *See, e.g., Murray v. State Farm Fire and Casualty Co.*, 203 W.Va. 477, 509 S.E.2d 1, 5 (W.Va.1998) (loss of use found when insureds were compelled to leave homes due to threat of falling rocks after nearby homes were harmed by falling rocks); *Hughes v. Potomac Ins. Co.*, 199 Cal.App.2d 239, 248–49, 18 Cal.Rptr. 650 (1962) (house unusable and suffered physical loss when backyard fell away in landslide, leaving house perched on the edge of a cliff, despite no structural damage to the house itself). Here, Defendant's alleged loss of use occurred only because Defendant was warned of potential flooding. It was not because a nearby facility flooded, because Defendant was forced to evacuate by officials due to the threat, or because any tangential side effect of flooding in the form of air or water pollution had begun to contaminate the facility. Defendant's claimed cause of its loss of use is the mere threat of flood. That threat, while real, did not prevent Defendant from using the facility for its ended purpose—storing data—as evidenced by the fact that people, equipment, and servers remained at the facilities throughout the summer, until Defendant could complete its very methodical evacuation. Here, no reasonable jury could find that Defendant lost use of the

facility during a period of time when it still used the facility to house people and key servers. *See Great Plains Real Estate Dev., LLC*, 536 F.3d at 944 (8th Cir.2008) (citation omitted) (issue of material fact genuine when it allows a "reasonable jury verdict for the nonmoving party."). Defendant has failed to demonstrate a genuine issue of material fact that it "lost use" of the Carter Lake facilities due to the threat of flood.

Furthermore, even assuming Defendant did lose use of the Carter Lake facility, the Court finds that mere loss of use does not constitute physical loss or damage under the Extra Expense Clause. Defendant relies primarily on *Murray v. State Farm Fire and Casualty Co.*, for support that loss of use alone is sufficient to constitute physical loss or damage. In *Murray*, falling rocks damaged several homes near the insureds' homes. Firefighters compelled the insureds to leave their homes due to the possibility of further rock fall, and the insureds had not returned home since that date. 203 W.Va. 477, 509 S.E.2d 1, 5 (W.Va.1998). The *Murray* court found that the loss of use of the "dwelling building" at issue was a sufficient direct physical loss to trigger coverage in that case. The court held that "[l]osses covered by the policy, including those rendering the insured property unusable or uninhabitable, may exist in the absence of structural damage to the insured property." *Id.* at 17.

The Court declines to adopt the reasoning in *Murray,* and instead focuses on the policy language at hand. Reading the policy in this case to require only loss of use would not give effect to the plain language of the policy. *Farm Bureau Life Ins.*, 831 N.W.2d at 133 (*citing Thomas*, 749 N.W.2d

at 682) (the court "refrains from straining the meaning of words and phrases of the policy to avoid imposing liability that was not intended and coverage that was not purchased."). While a loss of use may, in some cases, entail a physical loss, the Court does not find "loss of use" and "physical loss or damage" synonymous. Indeed, interpretation of physical loss as requiring only loss of use stretches "physical" beyond its ordinary meaning and may, in some cases "render the word 'physical' meaningless." *Source Food Tech., Inc. v. U.S. Fidelity and Guar. Co.*, 465 F.3d 834, 835 (8th Cir.2006) (finding no coverage under a policy covering "direct physical loss to property" when property was meat which was not allowed to cross the border into the United States and was thus treated as unusable but in fact suffered no spoilage or contamination); *Pentair, Inc. v. Am. Guarantee and Liab. Ins. Co.*, 400 F.3d 613, 616 (8th Cir.2005) (affirming district court's finding of no coverage under the policy because "[o]nce physical loss or damage is established, loss of use or function is certainly relevant in determining the amount of loss ... But [Plaintiff's] argument, if adopted, would mean that direct physical loss or damage is established *whenever* property cannot be used for its intended purpose."). This is one such case, particularly in light of the fact that physical loss is not a prerequisite to other coverage provisions. "Physical loss or damage" therefore requires a material [4] loss amounting to something greater than the threat of loss, even if that loss is tangential or minimal.

## B. Direct Physical Loss

Having determined that loss of use alone does not constitute physical loss in

4. Defendant argues that the monetary amount of damage and severity of damage is irrelevant, and that even minimal damage triggers the Extra Expense Clause. The Court makes

no determination on this point and uses the phrase "material" as a reference to the physicality of the damage rather than the importance or severity of the damage.

this case, the Court looks to the claimed physical loss suffered by Defendant to determine whether it triggers the Extra Expense clause. The parties agree that Defendant decided to move its business and property on or about June 1, 2011. The parties also agree that on August 22, 2011, Defendant's parking lot at the Carter Lake facility flooded duty to heavy rainfall. Defendant argues that it suffered several other instances of physical loss or damage to its building and equipment, including damage to an interruptible power source and loss of use of one computer room cooling unit. Pl. Res. to Deft. SUMF [Dkt. 74–2 ¶¶ 76–79, 45). Plaintiff argues that Defendant suffered no physical damage, citing Defendant's failure to claim any physical damage throughout the claim adjustment process as proof that Defendant never understood that it suffered physical harm within the meaning of the policy. The Court finds that whether Defendant suffered these physical losses is a genuine issue of material fact. However, even assuming Defendant suffered the alleged physical damage, the Court finds that the damage is not "direct physical loss" sufficient to trigger the extra expense provision. Such a determination requires interpretation of the word "direct."

In this context, "direct" is used as an adjective to describe the kind of physical loss required to trigger coverage. Direct, in this context, means "proceeding in a straight line or by the shortest course; straight; undeviating; not oblique" or "proceeding in an unbroken line of descent; lineal rather than collateral." *See* DICTIONARY.COM, *available at* dictionary.reference.com/browse/direct?s=t.

This definition is in line with cases interpreting similar language. For example, in *United Airlines v. Insurance Company of the State of Pennsylvania*, the Court interpreted a business interruption clause of an insurance policy insuring "against loss re-

sulting directly from the necessary interruption of business caused by damage to or destruction of the Insured Locations, resulting from [a covered cause of loss]." 385 F.Supp.2d at 345. The Court found that physical damage was unambiguously required to trigger the clause. The Court went on to find that, while United Airlines suffered some damage to its ticket counter as a result of the September 11, 2001, attacks, that damage was not the cause of the airline's discontinuing flights for a period of time or denial of access to the airport facilities. *Id.* at 350. The Court found that Plaintiff's position that this damage triggered coverage under the business interruption clause was "untenable because the amount of recovery sought bears no relation to the actual damage suffered at the [ ] Insured Location." *Id.* Therefore, the damage did not meet the policy's requirement of "direct correlation between the amount of recovery and the actual damage suffered." *Id.* at 351; *see also Universal Image Prod., Inc. v. Chubb Corp.*, 703 F.Supp.2d 705, 709 (E.D.Mich. 2010) (interpreting policy language covering "direct physical loss or damage to building or personal property caused by or resulting from a peril not otherwise excluded" with specific attention to "the causation aspect of this phrase in the context of an insurance contract").

Here, the only physical loss that could possibly trigger the Extra Expense Clause is the flooding to Defendant's parking lot and other minor damage Defendant claimed it sustained in or after mid-June 2011. Defendant cites damage sustained to the facilities in July, 2011, and August, 2011. [Dkt. 65–1 P. 16]. However, that damage does not constitute "*direct* physical loss" because there is no causal relationship between these alleged losses and Defendant's moving expenses. *See St. Joseph Light & Power Co. v. Zurich Ins. Co.*, 698 F.2d 1351, 1358–59 (8th Cir.1983) (poli-

cy covering "necessary Extra Expense" to continue normal operations ,"following damage to or destruction of real or personal property" required determination of which losses were caused by a covered cause of loss and which were caused by a non-covered cause of loss, finding that "where only a portion of the loss is attributable to [a covered cause of loss,] only downtime caused specifically by [that cause of loss] can constitute a basis for recovery under the policy"); *Acorn Inv. Co. v. Mich. Basic Prop. Ins. Ass'n*, 2009 WL 2952677, at *2 (Mich.Ct.App. Sept. 15, 2009) (defining "direct" in "direct physical loss" as "immediate or proximate cause, as distinct from remote or incidental causes); *Murray*, 509 S.E.2d at 10 ("direct loss by" covered cause requires the covered cause be "an efficient cause of the loss, and the qualifying word 'direct' in referring to the cause of the loss means 'proximate or immediate.' ").

Defendant has not and cannot show that physical damage allegedly suffered after it had already decided to and begun to relocate was the cause of its moving expenses. Defendant decided to begin its removal process on or about June 1, 2011. Defendant agrees that it moved to avoid the threat of flooding, rather than in response to any physical loss or damage. Deft. Motion [Dkt. 65-1 PP. 5-7; 65-2 ¶¶ 27-40, 46, 47]. Any physical damage did not occur until mid-June, and therefore could not possibly have caused Defendant's decision to move its business prior to its occurrence. Here, there was no direct physical loss without which expenses would not have occurred because the expenses began accruing prior to any argued instance of physical loss.

Defendant further argues that, because the policy defines "Covered Cause of loss" as "risk of direct physical loss," no actual direct physical loss is required. Instead, Defendant argues that the presence of a risk of direct physical loss is a covered cause of loss and therefore satisfies the "direct physical loss" requirement. The parties agree that risk of loss caused Defendant to move, and that costs incurred based on that risk and subsequent move due to risk may be covered under other policy provisions (namely the Preservation of Property clause). However, the definition of "Cause of loss" as including "risk of loss" refers only to the insured event claimed to *cause* harm, not the insured harm itself. *See Witcher Const. v. St. Paul Fire & Marine Ins. Co.*, 550 N.W.2d 1, 5 (Minn.App.1996) (distinguishing *Hampton Foods Inc. v. Aetna Casualty & Sur. Co.*, 787 F.2d 349 (8th Cir.1986), and requiring physical loss to trigger a loss of business continuity provision regardless of the policy's coverage of "risk of" loss as a covered cause of loss; distinguishing between insured cause of loss and insured property protected from loss). The Court is unwilling to collapse the policy's clear distinction between the cause of harm and the type of harm suffered. Therefore, the alleged cause of loss—whether physical or "risk" based—is irrelevant when it cannot be linked to the type of harm required.

Direct physical loss or damage is required to trigger the Extra Expense Clause. Here, the policy unambiguously requires direct physical harm beyond loss of use. Furthermore, the physical loss that was arguably suffered by Defendant after it decided to move does not constitute "direct" physical loss for purposes of the Extra Expense Clause. Defendant's expenses are not such that Defendant "would not have incurred [them] if there had been no direct physical loss or damage to property" because it incurred them prior to any such loss. Dkt. 64-3, P. 39. Defendant is therefore not entitled to recover costs under the Extra Expense Clause.

## 2. Preservation of Property Clause

Defendant argues that its various expenses are also covered by the Preservation of Property Clause. The Preservation of Property Clause reads, in part: "If it is necessary to move Covered Property from the described premises to preserve it from loss. or damage by a Covered Cause of Loss, we will pay for: ... Any direct physical loss or damage to this property ... and [t]he cost to remove the property from the described premises."[Dkt. 64–3 P. 21]. Defendant's covered property includes "Electronic Data Processing Equipment" and "Electronic Data Processing Data and Media." [Dkt. 73 P. 55].

The parties agree that Defendant is entitled to reimbursement for some of the costs of removing its covered property from the Carter Lake Facilities. However, the parties dispute the extent of that reimbursement. First, the parties dispute whether the Preservation of Property Clause entitles Defendant to reimbursement for the cost to re-establish Defendant's business operations at a new location. [Dkt. 65–1 P. 13]. Second, the parties dispute whether purchases of new servers and other equipment can constitute a "necessary cost to remove" such that its cost would be covered by the Preservation of Property Clause.

In defining the scope of the Preservation of Property Clause, the Court once again begins with the plain language of the clause. The dictionary defines "preserve" as "to keep safe from injury, harm, or destruction." *See* Merriam Webster Dictionary, *available at* http://www.merriam-webster.com/dictionary/preserve. Defendant details various articulations of the definition of "preserve" to argue that "preserving" property includes costs to "re-establish" business operations in a new location. In some contexts, this may very well be true. However, the Court cannot simply look at the action covered by the

Clause, and has to take into account the subject of that action: "Property." *See Larson v. Nationwide Agribusiness Ins. Co.*, 739 F.3d 1143, 1145 (8th Cir.2014) (viewing reasonableness of a proposed definition of a policy term in light of the context of the policy).

The Preservation of Property Clause covers property—not operations. This is indicated by both the title of the clause itself and by its language covering "[a]ny direct physical loss or damage *to this property* ... and [t]he cost to remove *the property* from the described premises" when it is "necessary to *move Covered Property.*" to preserve it from loss or damage. [Dkt. 64–3 P. 21] (emphasis added). Unlike the Extra Expense clause, which explicitly covers business income and operations, the Preservation of Property clause does not mention business operations, suspension of business, or relocation of the business. Reading the Preservation of Property clause to cover "business operations" would require the Court to read into the policy words which are not there, and which would render the Extra Expense Clause's business income and operations loss coverage unnecessary and redundant. *See Fashion Fabrics of Iowa, Inc.*, 266 N.W.2d at 26 (*citing* RESTATEMENT (2D) OF CONTRACTS § 229). The Extra Expense Clause explicitly covers those costs. [Dkt. 64–3 P. 39]. There is no indication that the Preservation of Property Clause is intended to cover costs associated with suspension of operation of re-establishment of operations.

Though the Court finds that Preservation of Property Clause does not cover costs to "re-establish business," that does not end the inquiry. Defendant argues that purchases of some new equipment were necessary to preserve its data, which existed before the time of removal, and constitutes covered property under the

Electronic Data endorsement. Therefore, the issue is whether some purchases, including additional servers and the extent of rent at a new location, constitute a non-covered cost to re-establish business or a covered cost to remove the covered property (namely, Defendant's data). Interpreting the Preservation of Property Clause broadly in favor of the insured, the Court finds that preservation of Defendant's data could have costs that preservation of other kinds of physical property would not. *See A.Y. McDonald*, 475 N.W.2d at 619 (citation omitted) ("Because insurance policies are in the nature of adhesive contracts, we construe their provisions in a light favorable to the insured."). The Court finds that Defendant is entitled to reimbursement for costs necessary to remove its property under the Preservation of Property clause, including its data. The question as to whether certain costs are "necessary" to remove the data constitutes a genuine issue of material fact that cannot be resolved on the instant motions for summary judgment.

### 3. Protection of Property Clause

Defendant also argues that the Protection of Property clause covers Defendant's mitigation expenses, including the cost to evacuate, build a berm, and build-out new facilities. Defendant's Motion for Summary Judgment ("Deft.Mot.") [Dkt. 65-1 P. 15–18]; Deft. Resist. [Dkt. 72 P. 12]. The Protection of Property clause is not itself a source of coverage. Instead, it is one in a list of "Duties in the Event of Loss" that the insured must perform "in the event of loss or damage to Covered Property." [Dkt. 64–3 P. 31]. These duties are under the general heading "Loss Conditions." [Dkt. 64–3 P. 31]. In the event of loss or damage to covered property, the insured must, among other things, "[t]ake all reasonable steps to protect the Covered Property from further damage, and keep a record of your ex-

penses necessary to protect the Covered Property, for consideration in the settlement of the claim." [Dkt. 64–3 P. 31]. This clause is what the parties refer to as the Protection of Property clause. The "Loss Payment" provision of the Loss Conditions section states that "[i]n the event of loss or damage covered by this coverage form," the insurer will pay for or reimburse the damage in the insurer's choice of ways. [Dkt. 64–3 P. 31].

The language "in the event of loss," repeated both in the general heading and again in the section's first sentence, unambiguously indicates that the described duties are only triggered when the insured suffers loss or damage. This interpretation is reinforced by the requirement that the insured take reasonable steps to avoid "further" damage. *See National Housing Bldg. Corp. v. Acordia of Virginia Ins. Agency, Inc.*, 267 Va. 247, 252–53, 591 S.E.2d 88 (Va.2004) (analyzing nearly identical language and finding loss necessary to trigger the duties in event of loss provisions); *Grebow v. Mercury Ins. Co.*, 241 Cal.App.4th 564, 575, 194 Cal.Rptr.3d 259 (2015) (finding a clause stating "In case of a loss to which this insurance may apply, you must perform the following duties ... protect property from further damage" to be unambiguous in its requirement that a loss trigger the duty to protect); *cf. Witcher Const. Co. v. St. Paul Fire and Marine Ins. Co.*, 550 N.W.2d 1, 7–8 (Minn.Ct.App. 1996) (finding that the mitigation clause "requires no action until a covered loss has already occurred," but that the insurer has a common law duty to mitigate even when the policy would not otherwise cover expenses). Any other interpretation would render the provision nonsensical. It would not be possible to perform the required duties if an insured had not suffered some loss or damage preceding performance of the duty. One cannot "notify police if a law may have been broken" if there was no precipitating event. Similarly, one cannot

give "prompt notice of the loss or damage [including] a description of the property involved," or "give us a description of how, when, and where the loss or damage occurred" if there was no lass or damage. [Dkt. 64-3 P. 31]. The language of the policy is unambiguous that these duties are not triggered in the absence of some sort of loss or damage. *See United Airlines v. Ins. Co. of the State of Pa.*, 385 F.Supp.2d at 347 (Language is unambiguous and may support a grant of summary judgment "when it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference in opinion."). Therefore, the Court must decipher the meaning of "loss or damage."

"Loss" is defined as "the act of losing possession," or "an instance of losing." MERRIAM WEBSTER, *available at* http://www.merriam-webster.com/dictionary/loss.
"Lose" is defined as "to undergo deprivation of something of value." Therefore, a "loss" denotes the deprivation of something of value or being unable to possess the item of value. "Damage" is defined as a type of loss, specifically "loss or harm resulting from injury to person, property, or reputation." MERRIAM WEBSTER, *available at* http://www.merriam-webster.com/dictionary/damage.

The plain language of the Protection of Property clause is notably broader than the Extra Expense clause. While the Extra Expense clause requires "direct physical" loss or damage, the Protection of Property clause requires only "loss or damage." The absence of these two modi-fiers to the required loss or damage to trigger the provision broadens the range of loss or damage that may trigger the Protection of Property clause. *See Farm Bureau Life Ins. v. Holmes Murphy*, 831 N.W.2d 129, 133 (Iowa 2013) (*citing A.Y. McDonald*, 475 N.W.2d at 619) ("If a word is susceptible to two interpretations, typically we adopt an interpretation favoring the insured."). Therefore, if Defendant was deprived of the ability to possess Covered Property or suffered a loss of value of or injury to Covered Property, the Protection of Property clause's harm element is satisfied.

The parties dispute whether Defendant suffered loss or damage sufficient to trigger the Protection of Property clause, oftentimes repeating the same arguments made in relation to the "direct physical" harm language of the Extra Expense clause despite the noted difference in the requirements between the two clauses. Defendant again argues that loss of use is sufficient to trigger the Protection of Property clause, and, in the alternative, maintains that physical losses suffered in July and August 2011 trigger the Protection of Property clause. Plaintiff maintains that Defendant suffered no loss of use of the Carter Lake facilities, and further argues that any alleged physical damage again cannot be the causal link to Defendant's claimed moving expenses.

As previously discussed, Defendant failed to show that it suffered loss of use of the Carter Lake facilities. The Court therefore focuses on Defendant's argument that physical loss triggered the Protection of Property clause.[5] Again, the

---

5. The Court notes that loss of use is insufficient to trigger the Extra Expense clause because loss of use is not "direct" or "physical." However, the Protection of Property clause has no such "direct" or "physical" requirement. Because this clause does not limit triggering loss to "direct" or "physical" loss, the Court construes the language broadly in favor of the insured, and finds that the plain language of the policy leaves open the possibility that loss of use may constitute a loss sufficient to trigger the duties in event of loss, when loss of use is actually suffered. *See Murray v. State Farm Fire & Cas. Co.*, 203 W.Va. 477, 493, 509 S.E.2d 1 (1998) (homes

Court finds a genuine issue of material fact exists as to whether Defendant suffered the physical harm it has alleged. Should the trier of fact determine that this damage occurred, this claimed damage is certainly "loss or damage" within the normal meaning of those terms and would have triggered Defendant's duty to "take all reasonable steps to protect the Covered Property from further damage." [Dkt. 64–3 P. 31].

The Court finds that a genuine issue of material fact exist as to whether Defendant suffered any alleged physical damage and, if so, what costs following that damage were "reasonable steps to protect" the damaged property from "further damage." The Court notes that costs to continue business operations do not fall within the language of this clause, and any expenses claimed under this provision must be incurred in an effort to protect already-damaged Covered Property. Therefore, any costs incurred prior to the suffering of a triggering loss are not recoverable under this provision, though they may be recoverable under the Preservation of Property clause.

### 4. Defendant's Common Law Claims

Defendant claims that, irrespective of the policy language, "the common law requires Travelers to pay the entirety of Infogroup's claim." Deft. Motion [Dkt. 65–1 P. 22]. First, Defendant claims that Plaintiff has a common law duty to reimburse Defendant's mitigation expenses. Second, Defendant claims that Plaintiff has a common law duty to reimburse Defendant under the "reasonable expectations" doctrine.

### A. Common Law Duty to Mitigate

Defendant first argues that the common law requires Plaintiff to pay for any expenses Defendant incurs in attempting to mitigate damage regardless of whether Defendant incurred any damage or loss. Defendant argues that "[a]n insurer is liable for the costs of mitigation under either the terms of the policy or an implied duty under the contract based upon general principles of law and equity." Deft. Motion [Dkt. 65–1 P. 22].

■ Here, the Court has already found a potential duty to mitigate under the terms of the policy. The Court has no occasion to provide additional common law coverage to these claimed expenses because they are covered by the explicit policy language in the Protection of Property and Preservation of Property clauses. *See Slay Warehousing Co., Inc. v. Reliance Ins. Co.,* 471 F.2d 1364, 1367–68 (8th Cir. 1973) (implying duty to reimburse mitigation expenses despite its not being expressly outlined in the policy when policy required insured to exercise "all reasonable means to protect, safeguard, and salvage" property); *Chang v. Brethren Mut. Ins. Co.,* 168 Md.App. 534, 897 A.2d 854, 862 (2006) (declining to decide the cases on the basis of the common law and instead focusing on the language of the policy). Here, the Court need not imply any duty to reimburse mitigation expenses because such duty is already made explicit in the policy. As discussed above in relationship to the Protection of Property clause, the extent to which mitigation expenses were reasonable under the various applicable policy provisions hinges on undecided genuine issues of material fact.

### B. Reasonable Expectations

■ Defendant argues that the reasonable expectation of the insured can form an independent basis for recovery even when a policy does not allow for or ex-

becoming unsafe for habitation found to constitute "real damage" when it became clear

that "rocks and boulders could come crashing down at any time).

pressly prohibits a claimed expense. The reasonable expectations doctrine is part of the "law interpreting insurance policies." *Clark–Peterson Co., Inc. v. Independent Ins. Associates, Ltd.,* 492 N.W.2d 675, 677 (Iowa 1992). However, "the doctrine does not contemplate the expansion of insurance coverage on a general equitable basis. The doctrine is carefully circumscribed; it can only be invoked where an exclusion '(1) is bizarre or oppressive; (2) eviscerates terms explicitly agreed to, or (3) eliminates the dominant purpose of the transaction.' " *Id.* (quoting *Aid (Mut.) Ins. v. Steffen,* 423 N.W.2d 189, 192 (Iowa 1988)).

▆▆▆ "Before the doctrine can be considered, a preliminary criterion must be satisfied. Either the policy must be such that an ordinary layperson would misunderstand its coverage, or there must be circumstances attributable to the insurer which would foster coverage expectations." *Id.* Neither situation is applicable here. Furthermore, Plaintiff argues that this doctrine applies only to cases where an exclusion prevents coverage. *See, e.g., id.;* *Bituminous Cas. Corp. v. Sand Livestock Sys.,* 728 N.W.2d 216, 222 (Iowa 2007) (explaining the reasonable expectations doctrine as applying to exclusions by finding the question of its applicability was not properly before the court). Defendant has cited no authority to the contrary. Furthermore, the language of the clauses at issue is generally clear; is not a case where only "painstaking study of the policy provisions would have" revealed an exclusion or neutralized an otherwise reasonable expectation. *Farm Bureau Mut. Ins. Co. v. Sandbulte,* 302 N.W.2d 104, 112 (Iowa 1981) (citation omitted). The reasonable expectations doctrine is not applicable here.

## 5. Defendant's Bad Faith Claim

Defendant claims that Plaintiff acted in bad faith in considering its claims and ultimately arriving at the conclusion that many of Defendant's claimed expenses were not covered by the policy. The Court dismissed this claim at the August 20, 2015, oral argument on the parties' motions for summary judgment and rearticulates that conclusion here.

▆▆▆ Iowa recognizes the implied covenant of good faith in contracts between insurance and insurance companies by recognizing the tort of bad faith. *See Vos v. Farm Bureau Life Ins. Co.,* 667 N.W.2d 36, 51 (Iowa 2003) (citing *Johnson v. Farm Bureau Mut. Ins. Co.,* 533 N.W.2d 203, 207 (Iowa 1995)). To establish a claim of bad faith, an insured must prove "(1) that the insurer had no reasonable basis for denying benefits under the policy[, and] (2) the insurer knew, or had reason to know, that its denial was without basis." *Rodda v. Vermeer Mfg.,* 734 N.W.2d 480, 483 (Iowa 2007) (citations omitted) (internal quotation marks omitted). The insured must prove each of these elements by substantial evidence, meaning that the insured has proved an element when "a reasonable mind would accept [the evidence] as adequate to reach a conclusion." *Sampson v. American Standard Ins. Co.,* 582 N.W.2d 146, 150 (1998) (citing *Stover v. Lakeland Square Owners Ass'n,* 434 N.W.2d 866, 873 (Iowa 1989)).

▆▆▆ "A reasonable basis for denying insurance benefits exists if the claim is 'fairly debatable' as to either a matter of fact or law." *Rodda,* 734 N.W.2d at 483; *Sampson,* 582 N.W.2d at 150 (citation omitted) ("An insurance company has the right to debate claims that are 'fairly debatable' without being subject to a bad faith tort claim."). An insurer cannot be held liable for bad faith when an objectively reasonable basis for denying a claim exists at the time of denial. *See Sampson,* 582 N.W.2d at 150 (citation omitted).

However, "[e]ven when the insurer lacks a reasonable basis for its denial of a claim, liability for bad faith will not attach unless the insurer knew or should have known that the basis for denying its insured's claim was unreasonable." *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 474 (Iowa 2005).

■ Defendant has failed to raise a genuine issue of material fact as to either requirement for bad faith. It was not objectively unreasonable for Plaintiff to think that Defendant is not entitled to the entirety of its claimed expenses under the above discussed policy provisions. The parties agree that Plaintiff has maintained that it would not cover the entirety of Defendant's expenses throughout the claim adjustment process and throughout these proceedings. These claims are "fairly debatable" as a matter of fact, and therefore Plaintiff has failed to demonstrate objective unreasonableness of denial. *Rodda*, 734 N.W.2d at 483. Furthermore, Defendant has made no showing that Plaintiff knew or should have known that it was acting unreasonably. There is no genuine issue of material fact as to whether Plaintiff acted in bad faith.

## IV. CONCLUSION

Here, genuine issues of material fact exist with respect to both parties' claims. FED. R. CIV. P. 56(e). The policy language makes clear that direct physical harm is required to trigger the Extra Expense Clause. Because the Court finds, as a matter of law, Defendant did not suffer "direct physical harm" within the meaning of the Extra Expense clause, Defendant is not entitled to recover under the Extra Expense clause. As the Extra Expense clause is the only clause which allows for coverage to continue business operations, Defendant is not entitled to recover costs to maintain business operations or re-establish business operations. However, Defendant is entitled to payment under the Preservation of Property clause for costs to "remove" its Covered Property, including its data, out of harm's way. The extent to which Defendant's claimed costs are, in fact, costs to remove rather than costs to re-establish business is a question of fact. Similarly, Defendant may be allowed to recover the value of the damage suffered to its property prior to the move. This question, too, hinges on a fact determination as to whether Defendant suffered alleged physical harm and precisely what expenses followed as an attempt to further protect against that same harm.

Upon the foregoing,

**IT IS ORDERED** that Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 is **DENIED.** Plaintiff's motion for summary judgment is **GRANTED** in part and **DENIED** in part.