**DEAN SNYDER CONSTRUCTION CO., Plaintiff,**

**v.**

**TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, Defendant.**

No. 4:15–cv–00154–JEG

United States District Court, S.D. Iowa, Central Division.

Signed March 23, 2016

Danya Marie Keller, Stephen D. Marso, Whitfield & Eddy PLC, Des Moines, IA, for Plaintiff.

Brian E. Devilling, Michael L. Foran, Foran Glennon Palandech Ponzi & Rudloff PC, Chicago, IL, Clark I. Mitchell, Guy R. Cook, Grefe & Sidney PLC, Des Moines, IA, for Defendant.

## ORDER

JAMES E. GRITZNER, Senior Judge.

This matter comes before the Court on Motion by Defendant Travelers Property Casualty Company of America (Travelers) to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Plaintiff Dean Snyder Construction Co. (Dean Snyder) resists. The Court held a hearing on the motion on November 5, 2015. Attorneys Steve Marso and Danya Keller appeared for the Plaintiff and attorneys Michael Foran and Clark Mitchell appeared for Travelers. The matter is fully submitted and ready for disposition.

## I. BACKGROUND

The City of Des Moines hired Dean Snyder as general contractor to build an aircraft maintenance facility at Des Moines International Airport in 2008 (the Project). Atlantic Steel Erectors, Ltd. (Atlantic Steel) was one of Dean Snyder's subcontractors on the Project. Travelers issued a commercial insurance policy (the Policy) for the Project that covered as "insureds" the City, Dean Snyder, Atlantic Steel, and others. Travelers received the required premium payments for issuing the Policy.

On June 26, 2008, a windstorm caused damage to the Project. Both Dean Snyder's and Atlantic Steel's damage and loss claims were covered by the Policy and both parties timely notified Travelers and made timely claims against the Policy for the losses and damages. After investigating Dean Snyder's and Atlantic Steel's claims, Travelers paid some of the claims and rejected other claims. Dean Snyder entered into a second contract with Atlantic Steel to rebuild and finish the structure damaged by the windstorm.

On July 19, 2013, five years after the windstorm, Atlantic Steel filed a lawsuit in Iowa District Court for Polk County asserting claims against Dean Snyder, Travelers, First Whitney Bank & Trust, the U.S. Treasury Department, and the Brown Winnick law firm, to recover, inter alia, unpaid damages and losses Atlantic Steel sustained as a result of the rebuild contract, *Atlantic Steel Erectors, Ltd. v. Dean Snyder Constr. Co. et al.*, Case No. LACL128211 (the Atlantic Steel Lawsuit).

The state district court ordered arbitration of Atlantic Steel's claims against Dean Snyder and stayed the lawsuit pending completion of arbitration. Neither Travelers nor the other defendants were ordered to arbitrate.

On May 8, 2014, the arbitrator issued his decision in favor of Atlantic Steel and against Dean Snyder and awarded Atlantic Steel $144,235. On August 11, 2014, the state district court confirmed the arbitration decision and issued judgment on the award. On February 11, 2015, a satisfaction of judgment was entered and Atlantic Steel filed a dismissal without prejudice of its claims against the defendants. Atlantic Steel did not further pursue its claims against Travelers. Dean Snyder demanded from Travelers a portion of the amount that Dean Snyder paid Atlantic Steel pursuant to the state court judgment. Travelers refused to pay.

Dean Snyder then filed this action against Travelers in Iowa District Court for Polk County on April 8, 2015. Travelers was served on April 20, 2015, and timely removed the case on May 15, 2015.

On June 1, 2015, Dean Snyder filed an amended complaint and attached thereto were: (1) the relevant provisions of the Policy; (2) the arbitrators' decision and award (the arbitration award); (3) the state district court's order confirming the arbitration award; (4) the satisfaction of judgment filed in Atlantic Steel Lawsuit; (5) Atlantic Steel's dismissal without prejudice of the Atlantic Steel Lawsuit; and (6) the original petition in the present case. Dean Snyder asserted claims for breach of contract, indemnity and/or contribution, subrogation, and unjust enrichment

Travelers' filed this motion to dismiss[1] pursuant to Federal Rule of Civil Procedure 12(b)(6) arguing the plain language of the insurance policy bars the present action; this case involves a property policy, not a third party liability policy; and Dean Snyder's unjust enrichment claim must be dismissed because under Iowa law, where there is an express contract, a different contract will not be implied.

## II. DISCUSSION

### A. Jurisdiction

Dean Snyder filed this case against Travelers in Iowa District Court for Polk

---

1. After removing this case, Travelers filed a pre-answer motion to dismiss the original complaint. Dean Snyder then filed an amended complaint modifying Counts 2 and 3 to include contractual indemnity and/or contribution and contractual subrogation claims, respectively. The Court denied Travelers' motion to dismiss as moot in light of the amended complaint and gave Travelers fourteen days to file a responsive pleading to the amended complaint.

County on April 8, 2015, asserting state law claims. Dean Snyder served Travelers with the petition and original notice on April 20, 2015 Travelers timely removed the case on May 15, 2015, see 28 U.S.C. § 1446(b), based upon diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332. Dean Snyder is an Iowa Corporation with its principal place of business in Clear Lake, Iowa. Travelers is a Connecticut company with its home office in Hartford, Connecticut. The amount in controversy exceeds $75,000. The requirements of diversity jurisdiction are satisfied as complete diversity exists between the plaintiff and defendant, and the amount in controversy exceeds the jurisdictional minimum. *See* § 1332.

## B. Standard for the Motion

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Benton v. Merrill Lynch & Co.*, 524 F.3d 866, 870 (8th Cir.2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Raynor v. Nat'l Rural Utilities Co-op. Fin., Corp.*, 690 F.3d 951, 955 (8th Cir.2012) (internal citation and quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 550 U.S. at 555, 570, 127 S.Ct. 1955)).

 In reviewing the sufficiency of a complaint, "[the Court] accept[s] the plain-tiff's factual allegations as true, but the allegations must supply facts sufficient to state a claim that is plausible on its face." *M.M. Silta, Inc. v. Cleveland Cliffs, Inc.*, 616 F.3d 872, 876 (8th Cir.2010). "Though matters outside the pleading may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Gorog v. Best Buy Co.*, 760 F.3d 787, 791 (8th Cir.2014) (quoting *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir.2012)). "Where, as here, the claims relate to a written contract that is part of the record in the case, [the Court] consider[s] the language of the contract when reviewing the sufficiency of the complaint." *M.M. Silta*, 616 F.3d at 876; *see Gorog*, 760 F.3d at 791 ("[T]he contracts upon which [a] claim rests ... are evidently embraced by the pleadings." (alterations in original) (quoting *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n. 4 (8th Cir.2003))); *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir.2011) ("In addressing a motion to dismiss, '[t]he court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record.'" (alteration in original) (quoting *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir.2010)). "A court may dismiss a claim under Rule 12(b)(6) as barred by the statute of limitations if the complaint itself establishes that the claim is time barred." *Illig*, 652 F.3d at 976 (citing *Jessie v. Potter*, 516 F.3d 709, 713 n. 2 (8th Cir.2008)).

The parties do not dispute that the Court applies the substantive law of the forum state—Iowa—to this diversity action. *See E–Shops Corp. v. U.S. Bank Nat. Ass'n*, 678 F.3d 659, 663, (8th Cir. 2012) ("We apply ... the forum state's substantive law [ ] because jurisdiction is based on diversity.").

## C. Analysis

### 1. Policy's Lawsuit Limitations

 Travelers first asserts this lawsuit was instituted nearly seven years after the loss resulting from the June 26, 2008 windstorm and it must therefore be dismissed because the plain language of the Travelers' policy bars legal action instituted more than two years after a party has knowledge of its loss. Dean Snyder disputes that it did not comply with the policy's two-year limitation provision and that even if it did not, it is excused from complying with the provision under the circumstances of this case.

Before scrutinizing the [insurance] policy, [the court] must observe the differences between interpretation and construction of an insurance policy. Interpretation requires us to give meaning to contractual words in the policy. Policy interpretation is always an issue for the court, unless we are required to rely upon extrinsic evidence or choose between reasonable inferences from extrinsic evidence. If the policy does not define a term, we give the word its ordinary meaning. The plain meaning of the insurance contract generally prevails.

Construction is the process of giving legal effect to a contract. This is always a matter of law for the court. The cardinal rule of construing insurance policies is that except in cases of ambiguity, the intent of the parties must control, and the court determines the intent of the parties by looking at what the policy itself says. We consider the parties' intent at the time the policy was sold, not in hindsight. We will not strain the words or phrases of the policy in order to find liability that the policy did not intend and the insured did not purchase.

*Boelman v. Grinnell Mut. Reinsurance Co.*, 826 N.W.2d 494, 501 (Iowa 2013) (internal citations omitted) (holding the reinsurance policy was not ambiguous and the reasonable expectations doctrine did not apply).

### a. Loss: 2008 Windstorm or Arbitration Award

 Travelers argues that the two-year limitations period began to run from the date of the physical loss, that is, the June 26, 2008 Windstorm, and not, as Dean Snyder advances, from the date third-party liability attaches, that is, the May 8, 2014 arbitration award in favor of Atlantic Steel. Dean Snyder argues that it first had knowledge of the direct loss no earlier than the date of the arbitration award, and therefore this action, filed on April 8, 2015, was filed within the Policy's two-year limitation provision. Dean Snyder further argues Travelers' third-party liability argument is irrelevant.

 The Policy's "Coverage" provision in relevant part states:

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

**1. Covered Property**

Covered Property, as used in this Coverage Part, means "Builders Risk".

**2. Covered Causes of Loss**

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL "LOSS" except those causes of "loss" listed in the Exclusions.

Travelers' Policy Excerpt (pg.269), Am. Compl—Ex. 1, ECF No. 6–1. The Policy defines "Loss" as "accidental loss or damage." *Id.* (pg.279).

The controlling consideration in construction of insurance policies is the intent of the parties. We determine intent by what the policy itself says except in cases of ambiguity. Ambiguity exists

when the language of a policy is susceptible to more than one reasonable interpretation. We read the insurance contract in its entirety, rather than reading clauses in isolation, to determine whether a policy provision is subject to two equally proper interpretations. We refrain from straining the meaning of the words and phrases of the policy to avoid imposing liability that was not intended and coverage that was not purchased.

When words are left undefined in a policy, we give them their ordinary meanings—meanings which a reasonable person would give them. We do not typically give them meanings only specialists or experts would understand. In searching for the ordinary meanings of undefined terms in insurance policies we commonly refer to dictionaries. If a word is susceptible to two interpretations, typically we adopt an interpretation favoring the insured. Mere disagreement, however, as to the meaning of the terms, does not establish ambiguity. Instead we examine whether the policy language, viewed objectively, is fairly susceptible to two interpretations. Ultimately, if there is no ambiguity, the court will not rewrite the policy for the parties.

*Farm Bureau Life Ins. Co. v. Holmes Murphy & Assocs., Inc.*, 831 N.W.2d 129, 134 (Iowa 2013) (internal citations omitted).

Dean Snyder argues the "June 2008 windstorm is clearly not a loss let alone 'the' loss for which any claim is being made," Pl.'s Br. 11, ECF No. 18, rather "the direct loss for which [Dean Snyder] is making claim" was known to Dean Snyder "no earlier than the date of the arbitration award," *id.* at 10. The Court must disagree.

Black's Law Dictionary defines "loss" as "[t]he amount of financial detriment caused by ... an insured property's dam-age, for which the insurer becomes liable"; "direct loss" as "[a] loss that results immediately and proximately from an event"; "physical" as "[o]f, relating to, or involving material things; pertaining to real, tangible objects," and "damage" as "injury to person or property; esp., physical harm that is done to something," Black's Law Dictionary Online (10th ed.2014). "The common usage of physical in the context of a loss therefore means the loss of something material or perceptible on some level. This understanding comports with other courts interpreting what constitutes "physical loss" under similar insurance provisions." *The Phoenix Ins. Co. v. Infogroup, Inc.*, 2015 WL 7755976, at *5 (S.D.Iowa Nov. 30, 2015) (citing *Milligan v. Grinnell Mutual Reinsurance Co.*, No. 001452, 2001 WL 427642, at *2 (Iowa Ct. App. Apr. 27, 2001) (unpublished table decision); *Universal Image Prod., Inc. v. Chubb Corp.*, 703 F.Supp.2d 705, 709 (E.D.Mich.2010); and *United Airlines, Inc. v. Ins. Co. of State of Pa.*, 385 F.Supp.2d 343, 349 (S.D.N.Y.2005), *aff'd*, 439 F.3d 128 (2d Cir.2006)).

In *Milligan v. Grinnell Mutual Reinsurance Co.*, No. 00–1452, 2001 WL 427642, at *2 (Iowa Ct.App. Apr. 27, 2001) (unpublished table decision), discussed further *infra* at Part II.C.1.c., the Iowa Court of Appeals rejected the insured's argument that the policy language regarding the date on which the direct physical loss or damage occurred was ambiguous and should be defined as either the date they received their repair estimates, the date the building was gutted, or the date the repairs commenced. *Milligan*, 2001 WL 427642, at *2. The court reasoned the term loss should be given its commonly understood meaning of damage or destruction, that damage, in turn, was "defined as injury to property," and thus "loss or damage as used in the suit limitation provision unambiguously referred to injury to or

destruction of the realty owned by the Insureds." *Id.* The court concluded,

> This common and ordinary meaning of loss or damage does not comport in any way with the Insureds' position that loss is measured by the time of claim estimates or repairs. Nor is the phrase objectively open to that interpretation on another basis. The district court correctly found the date of physical loss or damage was the date of the fire, and we affirm its decision in this regard.

*Id.*

Contrary to Dean Snyder's elastic construction of the terms "loss" and "damage," when those terms are given their common and ordinary meaning, the date of physical loss or damage was the date of the windstorm and not the date of the arbitration decision. Notably, Dean Snyder's argument overlooks that on the date the Arbitration Decision issued no "physical" loss occurred. *See The Phoenix Ins. Co.*, 2015 WL 7755976, at *8 (rejecting the insured's argument that losses related to vacating the insured premises upon threat of flooding that did not result in any physical damage were covered under the policy's direct physical loss provision finding the "insured's policy unambiguously require[d] direct physical harm beyond loss of use"). Rather, the physical loss occurred on the date of the windstorm. Moreover, but for the physical loss to the facility due to the windstorm, Dean Snyder would not have been in arbitration with Atlantic Steel over disputed rebuilding costs. The Court finds "direct physical loss" as defined in the Policy occurred on June 26, 2008 when the windstorm destroyed the facility.

To the extent Dean Snyder argues the Policy provides coverage for the action Atlantic Steel brought against it, the distinction between first and third party insurance contracts in Iowa, as well as in other states, is universally recognized and the limitation period on a first party property liability policy runs from the date on which a loss occurs, not the date on which damages from the loss are finally fixed, or when the insurer denies coverage for the claim. *See Kintzel v. Wheatland Mut. Ins. Ass'n*, 203 N.W.2d 799, 803 (Iowa 1973) (positing that the "'loss' issue must start with the question, precisely when does one measure or ascertain whether a windstorm loss has occurred? Is the loss to be fixed at the time of casualty so that, as long as the insured then has an insurable interest the insurer becomes obligated to pay under its policy, or can subsequent collateral events be taken into account in determining the existence of an insurable 'loss'?" and concluding that "the time of 'loss' as that term is used in the policy, refers to the date of casualty, ... [and thus] [i]It follows the 'loss' we are concerned with here should be defined and measured as of the date of the damage-causing windstorm" (citing *Olson Enters., Inc. v. Citizens Ins. Co. of N.J.*, 255 Iowa 141, 121 N.W.2d 510, 513 (1963)); *see also Couch on Insurance* § 198:3 (2014) ("'First-party' insurance is a contract between the insurer and the insured to protect the insured from its own actual losses and expenses. Property insurance, fidelity insurance, and medical/health insurance are all examples of first-party insurance. 'Third-party' insurance is a contract to protect the insured from losses resulting from actual or potential liability to a third party. This protection may involve defending the insured from suit, paying or settling a claim against the insured, or a combination of both. Liability insurance is third-party insurance.").

Finally, Dean Snyder argues "Travelers agreed, through issuance of its policy and receipt of premiums, to be ultimately responsible for [Atlantic Steel]'s *covered losses* that it wrongly rejected and which [Dean Snyder] paid." Pl.'s Resist. Br. 16,

ECF No. 18 (emphasis added). However, summarily disregarding Travelers' assertion that this is a property insurance policy and not a third-party liability by declaring, "[y]es, and so what," *id.* at 15–16, Dean Snyder notably contradicts its stated premise regarding what constitutes loss. It is undisputed that the damages sought in the Atlantic Steel Lawsuit and the subject of the arbitration decision were the costs Atlantic Steel incurred in rebuilding the structure following the 2008 Windstorm. Thus, Dean Snyder cannot maintain the covered losses for which it paid Atlantic Steel were incurred *both* on the date of the damage causing windstorm *and* on the date of the 2011 arbitration award. Under the facts of this case, clearly the loss is "defined and measured as of the date of the damage-causing windstorm." *Kintzel,* 203 N.W.2d at 803.

### b. Policy's Limitation Period

The Policy's "Legal Action Against Us" section states:

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all the terms of this Coverage Part; and

2. The action is brought within 2 years after you first have knowledge of the direct loss or damage.

Travelers' Policy Excerpt 268, Am. Compl.—Ex. 1, ECF No. 6–1.

Travelers argues that the two-year limitations provision is enforceable under Iowa law. *See Osmic v. Nationwide Agribusiness Ins. Co.,* 841 N.W.2d 853, 858 (Iowa 2014) (noting that while contractual claims "are presumptively subject to a ten-year statute of limitations, . . . parties to an insurance contract can modify the deadline for bringing suit," and concluding that under the facts of the case, the insurance policy's two-year limitation period was reasonable).

Dean Snyder reiterates its argument that the substitution of various definitions of words contained in the Legal Action provision results in a better interpretation of the Policy. Dean Snyder first suggests using the definition of "loss," which is "accidental loss or damage," then replace "accidental" with "direct," so the provision becomes: "The action must be brought within 2 years after you first have knowledge of the *direct loss or damage.*" Dean Snyder contends this is a better interpretation of the Policy language and leads to the question in this case: what constitutes *the* direct loss that triggered the limitation period?

Citing *Kintzel v. Wheatland Mut. Ins. Ass'n,* 203 N.W.2d at 803; *Gustafson v. C. Iowa Mut. Ins. Ass'n,* 277 N.W.2d 609, 610 (Iowa 1979); and *Bettis v. Wayne County Mut. Ins. Ass'n,* 447 N.W.2d 569, 570–71 (Iowa Ct.App.1989), Dean Snyder argues in an insurance policy, the word "direct" is synonymous with "proximate," and thus when the limitations provision is retooled to reflect this meaning it should be read to require that the action be brought within two years after the insured first has knowledge of the *proximate* loss or damage. Finally, citing *Stamp v. W. Iowa Mut. Ins. Ass'n,* No. 06–1825, 2007 WL 2255460, at *2 (Iowa Ct.App. Aug. 8, 2007) ("An insurer has a duty to define any limitations or exclusions in clear and explicit terms . . . . Ambiguous policy provisions are interpreted in favor of the insured because insurance policies are in the nature of adhesion contracts."); *Weitz Co., LLC v. Lloyd's of London,* 574 F.3d 885, 890 n. 3 (8th Cir.2009) ("We decline the Insurers' invitation to ignore the Policies' plain language in order to avoid what they perceive to be an 'absurd result.' If the Insurers believed their own policy language was absurd, then they should have drafted different language."), Dean Snyder contends that if Travelers wanted the

*proximate cause* of the loss, as opposed to the proximate loss itself, to trigger the two-year limitations period, Travelers should have clearly and explicitly said so. (Dean Snyder's. Br.10, ECF No. 18) The Court must disagree. *Kintzel, Gustafson,* and *Bettis* do not support the proposition advanced by Dean Snyder.

In *Kintzel,* the question before the court was whether anyone had an insured interest in the property at the time it was damaged by a windstorm. *Kintzel,* 203 N.W.2d at 802. The named plaintiff, Kintzel, bought property on contract from Proesch (the Proesch–Kintzel contract). As a condition of that purchase, Kintzel had to maintain insurance on the property, and on the policy, Proesch was designated "owner" of the property. *Id.* While an unpaid balance remained on the Proesch–Kintzel contract, Kintzel sold the property to Hicks. *Id.* Before Hicks secured insurance, a windstorm caused severe damage to the property. *Id.* Kintzel filed a timely proof of loss, but the defendant insurer denied the claim reasoning that at the time of the loss, Kintzel's interest in the property was that of a creditor and because the value of the property exceeded the unpaid balance, Kintzel suffered no "direct loss." *Id.* Kintzel sued the insurer and then assigned to Hicks all the interest in the Kintzel–Proesch contract, including the cause of action against the insurer; Hicks intervened as Proesch's assignee. *Id.* The trial court agreed with the insurer's position but on appeal, a divided Iowa Supreme Court concluded Proesch's designation on Kintzel's policy as owner gave Proesch the same rights as a mortgagee, which under the plain language of the policy afforded Proesch an independent right to sue, and thus Proesch's interest was measured by the unpaid purchase price. *Id.* at 803. The court further concluded that contrary to the insurer's assertion, Proesch's assignment to Hicks occurred after the windstorm and was an assignment of the cause of action, not of the insurance policy. *Id.*

The court then discussed the insurer's contention that it had no obligation to pay under the policy because neither Proesch nor Kintzel suffered a "direct loss." *Id.* at 807. The court depicted the insurer as having "ingeniously equate[d] the phrase 'direct loss' with a current reduction in claimant's net worth, ascertained in a collateral and entirely speculative inquiry." *Id.* The court distinguished that " 'direct loss' as that phrase appear[ed] in the policy," did not mean, as the insurer suggested, an immediate impact on the contents of [the insured]'s wallet," rather " '[d]irect loss by windstorm' merely mean[t] damage due to the strength or force of the wind." *Id.* at 808. As discussed above, in determining whether the loss amount was based on the contract price or the value of the property, the Kintzel court reasoned:

> The 'loss' issue must start with the question, precisely when does one measure or ascertain whether a windstorm loss has occurred? Is the loss to be fixed at the time of casualty so that, as long as the insured then has an insurable interest the insurer becomes obligated to pay under its policy, or can subsequent collateral events be taken into account in determining the existence of an insurable 'loss'?

> This policy provides the obligation of the defendant is limited (with certain exceptions) by the actual cash value of the property at the time of loss.' The insured must ' * * * give immediate written notice * * * of any loss (and) protect the property from further damage * * *.' The insured must render 'proof of loss' within 'sixty days after the loss.' Obviously, the time of 'loss' as that term is used in the policy, refers to the date of casualty.

*It follows the 'loss' we are concerned with here should be defined and measured as of the date of the damage-causing windstorm.*

*Id.* at 810 (emphasis added).

In *Gustafson,* the court had to determine *whether* the insured suffered a loss. *Gustafson,* 277 N.W.2d at 610. The insureds in *Gustafson* bought and installed steel "Morton Buildings" on their farms, which came with a five-year warranty to replace and reinstall the buildings if the buildings were directly damaged by snow or wind. The owners also had insurance policies covering the buildings from fire, wind damage, and other perils. The insurers did not inform the owners that coverage would be denied for damage repaired or replaced under the Morton Buildings' warranties. *Id.*

While the Morton Buildings were still under their respective five-year warranties, a tornado totally destroyed the Morton Buildings as well as other buildings on the farms. The owners promptly contacted their insurers and "[p]roper measures were taken to report the losses and demand settlement." *Id.* Morton Buildings replaced the damaged steel buildings at its expense under the warranties. The insurers denied payment as to the Morton Buildings and the owners sued. The trial court awarded the insureds the policy limits and the insurers appealed arguing (1) no loss occurred when the wind destroyed the Morton Buildings because they were replaced without charge under the warranties, and (2) the Morton Buildings' warranties constituted other insurance within the meaning of the insurance policies.

The Iowa Supreme Court concluded that the owners were not barred from recovering insurance proceeds on the destroyed buildings because they benefitted from the collateral recovery under the warranties. *Id.* at 611. In reaching this conclusion, the court dismissed the insurers' argument

that "if the repair or replacement policy language is to be given effect, the question in issue is not the amount of 'loss' sustained by the insureds, but, rather, the cost to the insureds to repair or replace the structures." *Id.* The court noted that, as used in the policy, 'direct loss' meant the "damage due to the strength or force of the wind" and 'the time of loss' "refer[red] to the date of casualty," which should be "measured as of the date of the damage-causing windstorm." *Id.* (citation and quotation marks omitted). Applying the principal set out in *Kintzel,* the court stated "the amount of the 'direct loss' must be tied to the date of the windstorm and not to some speculative future date on which the warrantor may honor the terms of his warranty to repair or replace the building." *Id.* at 611. The court concluded:

This construction avoids hardship on the insured which might result if the assessment of loss were postponed. Had a dispute arisen as to whether Morton was liable under the warranty to replace the destroyed buildings, the insureds would have remained uncompensated for the destruction of the buildings while waiting on the outcome of the warranty dispute. *A more reasonable interpretation of the policies is that the losses to the insureds in the present cases must be assessed at the date of the windstorm and not after Morton had replaced the buildings.*

*Id.* (emphasis added).

As with *Kintzel,* the direct loss discussion in *Gustafson* is not favorable to Dean Snyder's position in the present case. In both *Kintzel* and *Gustafson,* the Iowa Supreme Court reasoned that the direct loss was to be assessed at the date of the damage-causing event, which in both *Kintzel* and *Gustafson* was a windstorm, and not at some speculative future date. Here,

Dean Snyder argues the amount of loss could not be calculated until Atlantic Steel completed the work and submitted a final bill. The removal, repair, and reconstruction costs, which constituted the direct loss due to the windstorm, was calculable within the two-year limitations period despite the fact that Dean Snyder had not yet been held accountable for the amount.

In *Bettis*, the Iowa Court of Appeals addressed whether the plaintiff's collision insurance policy covered damage to the tractor's transmission when it was improperly towed from the scene of the tractor collision. *Bettis*, 447 N.W.2d at 569–70. Citing *Kintzel*, the court concluded the damages were covered under the policy reasoning that the term "direct loss by fire" was synonymous with "proximate cause," albeit applied differently in the insurance context than in the tort context. *Id.* at 570–71. The court stated that in the insurance context, "an insured event is considered the proximate cause of a loss if the event sets in motion other causes which, through an unbroken sequence and connection, result in the loss," however, the court "look[s] not necessarily to the last act in the chain of events, but rather to the predominant cause which set in motion the chain of events causing the loss." *Id.*

*Bettis* is distinguishable from the present case. In that case, the court found the additional damage to the transmission caused by improper towing would not have occurred but for the tractor collision and therefore, that damage was part of an unbroken sequence of events starting with the covered event. Here, Travelers is not denying coverage of *additional foreseeable* damages proximately caused by the windstorm. Rather, Dean Snyder argues the loss amount was unknowable until the costs were fully submitted, disputed, and arbitrated. Iowa law does not accommodate this type of a delay. The loss as

defined in the Policy occurred on the date of the 2008 windstorm, which triggered the Policy's limitations provision.

### c. Enforceability of the Policy's Limitations Provision

■ Dean Snyder challenges the enforceability of the Policy's two-year limitation provision. This challenge, however, is foreclosed under Iowa precedent.

In *Milligan*, 2001 WL 427642, at *2, the Iowa Court of Appeals rejected the insured's interpretation that the policy's two-year limitations period did not begin to run until the date the insurer rejected the insured's liability claim. Responding to the plaintiff's argument that because the policy did not define direct physical loss or damage it was ambiguous and subject to multiple interpretations, the court first noted that "[a]mbiguity is not established merely because the parties disagree on the meaning to be given the term"; "[u]ndefined insurance policy terms are given their ordinary and reasonable connotations"; and "[a]n undefined policy term does not automatically equate to an ambiguous term, particularly if the dictionary meaning is the one commonly understood by the average person." *Id.* The court reasoned the dictionary defined "loss" as damage or destruction and defined damage as injury to property. *Id.* The court concluded "that loss or damage as used in the suit-limitation provision unambiguously referred to injury to or destruction of the realty owned by the Insured." *Id.* The court went on to state that this "conclusion finds further support in the fact that the loss or destruction must be physical in nature, that policy references to loss and damage clearly indicate the necessity of a destructive act or occurrence and that the proof of loss statements, signed by the Insureds, explicitly refer to the date of the fire as being the date of loss." *Id.* The court concluded the meaning of the terms

loss or damage did "not comport in any way with the [i]nsureds' position that loss [wa]s measured by the time of claim estimates or repairs. Nor [wa]s the phrase objectively open to that interpretation on another basis." *Id.*

In *Osmic v. Nationwide Agribusiness Ins. Co.*, 841 N.W.2d at 855, the plaintiffs, Osmic and his children, were injured in a motor vehicle accident that occurred on May 23, 2009. The vehicle carrying Osmic and his children was insured by Nationwide and the vehicle at fault for the accident was insured by Progressive. Osmic suffered a shoulder injury that eventually required surgery. When Osmic's lawyer notified Nationwide about the claim, Nationwide requested Osmic's medical records for the three years prior to the accident. In the meantime, Osmic's attorney sent Progressive a demand letter seeking $178,500 for Osmic's injuries, and $13,000 for each of Osmic's two children. Progressive had previously notified Nationwide that due to settlement of other claims only $35,000 of $100,000 policy limit remained and offered to pay $25,000 for Osmic's injuries and $5,000 for each child's injuries. *Id.* at 856. Osmic's attorney contacted Nationwide inquiring about Nationwide's UIM coverage and asked whether Osmic should accept Progressive's settlement offer. Nationwide consented to the settlement with Progressive but indicated it needed more time and information regarding Osmic's claim against the Nationwide UIM policy. On May 27, 2011, two years and four days after the accident, Nationwide notified Osmic that the Nationwide policy's UIM coverage was barred because suit was not brought within two years of the accident as required under the UIM provision. *Id.* at 857. On June 23, 2011, one month after the Nationwide's UIM policy limitations period expired, Osmic commenced suit against Nationwide. The district court denied Nationwide's motion for summary judgment finding Osmic was

not a party to the policy and thus not bound by the limitation provision. The Iowa Court of Appeals affirmed.

On further review, the Iowa Supreme Court vacated the Court of Appeals' decision and reversed the district court holding: (1) although UIM claims are contractual and presumptively subject to a ten-year statute of limitations period, "parties to an insurance contract can modify the deadline for bringing suit"; (2) a contractual limitations period is enforceable if it is reasonable; (3) the two-year limitation was reasonable because Osmic, who was represented by counsel, knew of his injuries and that the Progressive policy coverage would be inadequate prior to the expiration of the limitations period; (4) as third-party beneficiary, Osmic's rights were controlled by the terms of the contract; and (5) Nationwide had no affirmative duty to advise Osmic of the contractual deadline for filing suit. *Id.* at 860–66. The court went on to hold that Nationwide was not estopped from asserting the limitations defense because the record showed no misrepresentation or concealment of the UIM endorsement and limitations provision.

Similarly, in *Robinson v. Allied Property & Casualty Ins. Co.*, 816 N.W.2d 398, 400 (Iowa 2012) the Iowa Supreme Court held valid and enforceable the insurance policy provision that required the insured to bring suit within two years of the accident. In that case, two years after the accident, the plaintiff, Robinson, had no definitive diagnosis as to the extent of her injuries and had not settled her claim against the other driver's insurer, State Farm. *Id.* at 401. Robinson filed suit against State Farm but did not file an action against her own UIM policy insurer, Allied, within the two-year contractual limitation period nor did she request an extension through a tolling agreement. *Id.*

Two years into the State Farm litigation, and four years after the accident, Robinson received a diagnosis and prognosis regarding the extent of her injuries. *Id.* State Farm offered to settle with Robinson for the policy limit of $100,000. *Id.* Robinson contacted Allied about State Farm's settlement offer and also offered to settle with Allied for $50,000 on the UIM policy. *Id.* Allied denied the UIM claim as untimely based on the policy's two-year limitations provision. *Id.* Robinson accepted State Farm's settlement offer. *Id.* Almost two years later—nearly six years after the accident—Robinson sued Allied under the UIM provision. *Id.* The district court granted Allied's motion for summary judgment enforcing the contractual provision. *Id.* On appeal, the Iowa Court of Appeals reversed reasoning the limitations period was unreasonable under the circumstances of the case. *Id.*

The Iowa Supreme Court granted Allied's petition for further review and reversed the Iowa Court of Appeals. The court held the two-year limitations period matched Iowa's two-year statute of limitations for personal injury and declined to invalidate it as unreasonable noting whether under the statute or under the contract, "the injured party must file suit within two years even if the full extent of the injury is not reasonably discovered until later." *Id.* at 399. In discussing the ethical and practical considerations of enforcing a contractual limitations period, the court noted an insured has options when faced with a contractual deadline in the absences of knowing the full extent of injury.

Attorneys facing a contractual deadline should assume the UIM action will be barred once the contractual deadline expires and should act to protect the client's interests. We could find no case sanctioning an attorney for a frivolous pleading filed to preserve a UIM claim on the eve of a deadline. The reasonable course of action is simply for the plaintiff's counsel to request a tolling agreement from the UIM insurer, which in all likelihood would be forthcoming. If the UIM insurer balks, the attorney reasonably can file the UIM claim without violating Iowa Rule of Civil Procedure 1.413 or Iowa Court Rule 32:3.1. The future course of a person's medical condition—especially a neck injury as here—is inherently open to some doubt. An attorney who has made a reasonable inquiry and has not received a definitive determination that the client's damages will be within the tortfeasor's policy limits does not violate either rule by bringing a precautionary action against the UIM carrier. The district court would have discretion to stay the UIM claim pending resolution of the underlying tort action or to permit the case to proceed to trial, as many Iowa personal injury actions do while the plaintiff continues medical treatment. UIM insurers do not like to incur avoidable defense costs any more than plaintiff's attorneys like to prosecute UIM claims expected to be resolved within the tortfeasor's policy limits. Both sides will be motivated to agree to toll the UIM contractual statute of limitations under the circumstances of this case.

*Id.* at 407.

Dean Snyder argues that unlike *Robinson*, it is not the extent of its loss that was unknown until after the limitations period expired, rather the loss itself did not occur until after the limitations period expired. Accordingly, Dean Snyder argues *Robinson* does not apply, but *Faeth v. State Farm Mutual Automobile Ins. Co.*, 707 N.W.2d 328, 330 (Iowa 2005), and *Nicodemus v. Milwaukee Mutual Ins. Co.*, 612 N.W.2d 785 (Iowa 2000) apply. The Court must disagree.

The *Robinson* plaintiff similarly relied on *Faeth* and *Nicodemus*, and the *Robinson* court distinguished those cases on the

same bases that they are distinguishable here.

In *Faeth* and *Nicodemus*, we invalidated contractual deadlines as unreasonable on grounds inapplicable here. In *Faeth*, the plaintiff was injured when his vehicle was rear-ended by a truck owned by Umthun Trucking Company and operated by its employee. Umthun was self-insured for liability under the authority of the United States Department of Transportation. Plaintiff timely sued Umthun in tort within two years of the accident. Umthun became insolvent over four years after the accident. We held the postaccident insolvency of a legally sanctioned self-insurer triggered the statutory right to uninsured motorists benefits. *Faeth's* policy required UM claims to be filed within two years of the accident. Significantly for present purposes, *Faeth* could not have filed a claim for UM benefits during the two-year contractual limitations period because Umthun was solvent and therefore deemed insured. Under those unique circumstances, we held the two-year limitation in the policy was unreasonable as applied because it left *Faeth* with no time to sue following the accrual of his claim. We noted that UM benefits are statutorily required and would be forfeited if the contractual deadline was enforced. By contrast, Robinson had two years from her accident during which time she could have sued Allied for UIM benefits. We do not equate her lack of appreciation of the extent of her injuries to *Faeth's* legal inability to bring a UM claim until the self-insured trucker became insolvent.

*Nicodemus* also fails to support Robinson's position. The contractual limitations provision in that case required the insured to conclude her tort action by settlement or judgment before filing her UIM suit within two years of her accident. We contrasted that policy provision with the two-year statute of limitations for personal injury claims in Iowa Code section 614.1(2), noting the legislature has deemed it appropriate to give an injured party two years simply to investigate her claim against a tortfeasor and get her lawsuit on file. Here, the Allied policy merely required Robinson to file her lawsuit within two years—she was not required to also conclude her tort claim by settlement or judgment by that deadline. The policy provision found per se unreasonable in *Nicodemus* was much more onerous than the tort statute of limitations. By contrast, the Allied provision simply imposed the same burden on Robinson as the legislature imposed on tort claimants—the obligation to file suit by the two-year anniversary of the accident.

Neither *Nicodemus* nor *Faeth* required a fact-intensive inquiry into when the insured knew or should have known her damages exceeded the tortfeasor's liability limits. We recognize that *Faeth* invalidated the contractual limitation as applied here. But, we did not have to engage in any factual analysis to reach that conclusion. The only relevant fact we had to consider was that Umthun became insolvent more than two years after the accident. On that basis, we declined to enforce the clause as a matter of law. Here, by contrast, we are asked to embark on an approach that would require sifting through the medical evidence to determine whether the insured had a reasonable basis to believe her damages exceeded the tortfeasor's policy limits. Neither *Nicodemus* nor *Faeth* requires us to invalidate Allied's two-year deadline as unreasonable on grounds that Robinson could not ascertain the full extent of her injuries within that period.

*Robinson*, 816 N.W.2d at 403–04.

Here, Dean Snyder does not deny that the amount of the loss resulting from the

windstorm was ascertainable within the two-year limitation period, but instead asserts its loss did not occur until it was found liable following arbitration. Applying this theory produces the untenable result that an insurer's coverage obligation does not arise unless or until liability is imposed on the insured. This is similar to the argument advanced by the insurer in *Gustafson*, 277 N.W.2d at 610, which the Iowa Supreme Court rejected. Iowa law does not support Dean Snyder's theory of recovery.

Iowa courts and federal courts applying Iowa law have enforced contractual limitations periods contained in other insurance policies. *See, e.g., Slife v. Farmers Mutual Hail Ins. of Iowa*, 845 N.W.2d 719, at *1–4 (Iowa Ct.App. Feb. 5, 2014) (unpublished table decision) (finding the one-year limitation provision in a property damage policy to be enforceable and reasonable where the insurer notified the insured of its decision to deny coverage well within the limitation period but the insured waited almost two years after the damage occurred to file an action against the insurer); *Ingrim v. State Farm Fire & Casualty Co.*, 249 F.3d 743, 745–46 (8th Cir.2001) (finding the one-year limitation provision in the insured's fire policy barred both the breach of contract and the bad faith causes

of action because the bad faith cause of action arose out of the insurer's handling of the fire damage claim and therefore was not an independent or collateral cause of action to the breach of insurance policy claim).[2]

Under Iowa law, the Policy's two-year limitation provision is enforceable and is not dependent on whether the exact amount for which Dean Snyder was liable to Atlantic Steel as a result of damage caused by the windstorm was ascertained during the limitations period. As with the plaintiff in *Robinson*, 816 N.W.2d at 407, nothing prevented Dean Snyder from preserving its claim by requesting a tolling of the limitations period pending resolution of the dispute with Atlantic Steel and/or from bringing a declaratory judgment action against Travelers. Instead, Dean Snyder waited more than seven years after the 2008 windstorm to file an action against Travelers. Under the circumstances of this case, the two-year limitations period is enforceable and precludes Dean Snyder's claims against Travelers.

### d. Application of Limitations Provision to Indemnity/Contribution and Subrogation Claims

Dean Snyder's indemnity/contribution count is duplicative of its breach of con-

---

**2.** In its original brief, Travelers cites *Douglass v. American Family Mutual Ins. Co.*, 508 N.W.2d 665, 665 (Iowa 1993), *overruled by Hamm v. Allied Mut. Ins. Co.*, 612 N.W.2d 775, 784 (Iowa 2000), for the proposition that the policy's two-year limitations provision barred the plaintiff's under insured motorist claim. As Dean Snyder notes in resistance, *Douglass* was overturned in relevant part by *Hamm*. However, *Hamm* overturned *Douglass* based on the limitation provision, which was the same in both policies. The *Hamm* court reasoned that while the provision required the insured to bring an action against, or settle with, the tortfeasor within two years of the date of the accident to preserve the insured's right to recover under the insured's underinsured motorist provision, the policy

did not establish when the limitations period began to run on the insured's claim against the UIM benefit. *Id.* at 776–77. The *Hamm* court reiterated the legal standard stated in *Douglass* that "an insurance company may validly shorten the limitations period for bringing suit for UM benefits from what would normally be ten years," but overruled the holding in *Douglass* to the extent that the *Douglass* court mischaracterized the policy language regarding when the limitations period commenced and held that "[a]bsent specific language in the [insurance] policy concerning when the limitations period begins to run, [Iowa] appl[ies] traditional rules regarding commencement of the contract statute of limitations to make this determination." *Id.* at 784.

tract claim, *compare* Am. Compl. ¶¶ 30–31, *with* Am. Compl. ¶¶ 23–25, and thus is similarly barred by the Policy's limitation provision. Dean Snyder's subrogation claim, which is premised on the theory that Dean Snyder acquired Atlantic Steel's rights against Travelers by satisfying the arbitration award, fails because Atlantic Steel's claims against Travelers were also subject to the two-year limitations provision. *See Allied Mut. Ins. Co. v. Heiken*, 675 N.W.2d 820, 825 (Iowa 2004) (detailing a party's subrogation rights "are limited to the rights of recovery possessed by the insured" and are "subject to all defenses ... [that] could [be] asserted against the insured"). Atlantic Steel did not file its lawsuit against Dean Snyder and Travelers until 2013, more than five years after the 2008 windstorm, and therefore even if Dean Snyder acquired subrogation claims against Travelers from Atlantic Steel, those claims were barred by the two-year limitations provision.

### 1. Indemnity/Contribution Claim

Travelers argues in the alternative, Dean Snyder's indemnity and/or contribution claim must be dismissed because the Policy does not cover liability to third parties noting the fundamental difference that a property policy cover an insured's direct physical losses and a liability policy cover an insured's liability to other parties. *See Wells Dairy, Inc. v. Am. Indus. Refrigeration, Inc.*, 762 N.W.2d 463, 469 (Iowa 2009) ("Indemnification is a form of restitution. Indemnity shifts the entire liability or blame from one legally responsible party to another. Indemnity is, in short, a redistribution of risk." (citations omitted) (citing Iowa cases)). In resistance, Dean Snyder reiterates its argument that Travelers's duty arose upon issuance of the arbitration award.

Under Iowa law, an indemnity obligation can arises either by statute or at common law. *See Hansen v. Anderson,*

*Wilmarth & Van Der Maaten,* 630 N.W.2d 818, 823 (Iowa 2001) ("Statutory indemnification is that which is permitted under the Iowa Code" and "[c]ommon-law indemnity can arise either by contract or, as in case of a tort, by law."). It is undisputed that there is no statutory basis for indemnification in this case. *See id.* (describing that statutory indemnification arises, "[f]or example, under Iowa Code section 85.22(1), [when] 'an employer or employer's insurer has a statutory right to be indemnified and to have a lien on any recovery or judgment entered in an action against a third-party tortfeasor'" (quoting *Daniels v. Hi-Way Truck Equip., Inc.*, 505 N.W.2d 485, 487 (Iowa 1993)). Iowa recognizes common law indemnity arising through: "(1) express contract; (2) vicarious liability; (3) breach of an independent duty between the indemnitor and indemnitee; and (4) the primary or active tortious conduct of the indemnitor as compared to the secondary or passive tortious conduct of the indemnitee." *Id.* (citing *Farmers Coop. Co. v. Stockdales' Corp.*, 366 N.W.2d 184, 186 (Iowa 1985)). None of those bases are present in this case.

The arbitration award order itself refutes Dean Snyder's argument that Traveler's duty arose upon issuance of the arbitration award. The arbitration award order details two agreements between Dean Snyder and All Steel: the original subcontract to erect steel, sheet, and insulate a new facility at the airport and a subsequent (Blow Down) agreement to rebuild the facility to the point it was before the 2008 windstorm. Travelers was not a party to either of those agreements. *See* Arbitration Award 1–2, 1st Am. Compl. attach. 2, ECF No. 6–2 ("After the Blow Down, [Atlantic Steel] was involved in the clean up and was asked by [Dean Snyder] to submit a bid for a new agreement to rebuild the facility to the point the facility was at before the Blow Down. A builder's

risk policy was issued by Travelers which covered the rebuild work and any expediting work up to $100,000. [Dean Snyder] instructed [Atlantic Steel] to not contact Travelers directly, and accordingly, [Atlantic Steel] only dealt with [Dean Snyder]."). It is undisputed that Travelers had no statutory duty to indemnify Dean Snyder. Under the circumstances, it is also clear that Travelers had no contractual duty to indemnify Dean Snyder because the only contract between Travelers and Dean Snyder is the Policy, under the terms of which Travelers had an obligation to provide coverage to Dean Snyder or Atlantic Steel (as an additional insured) for direct physical losses from the 2008 windstorm but not for loses as a result of the arbitration award that arose out of the subcontracts between Dean Snyder and Atlantic Steel. *See McNally & Nimergood v. Neumann–Kiewit Constructors, Inc.*, 648 N.W.2d 564, 577 (Iowa 2002) ("[A] claim for contractual indemnity must be covered by the contract.").

Dean Snyder counters that the existence of a joint duty does not need to arise from the *same* contract and that equitable indemnity arises from noncontractual obligations. Under Iowa law, while contribution and indemnity claims may arise where multiple parties have separately violated a duty to a third party, *see Bolton v. Ziegler*, 111 F.Supp. 516, 521 (N.D.Iowa 1953), and Dean Snyder had obligations to Atlantic Steel arising out of the subcontract between those two parties, Travelers was not a party to those subcontracts and thus had no duty to Atlantic Steel thereunder.

Dean Snyder cannot maintain its contractual indemnity/contribution claim unless the Court adopts Dean Snyder's definition of loss occurring when the arbitration award was issued. Because the Court has already rejected Dean Snyder's definition of loss finding the loss in this case is "defined and measured as of

the date of the damage-causing windstorm," *Kintzel*, 203 N.W.2d at 803, Dean Snyder's indemnity/contribution claim must be dismissed.

### 2. Unjust Enrichment Claim

Travelers argues Dean Snyder's unjust enrichment claim must also be dismissed because where, as here, an express contract exists, that contract governs and Iowa courts will not imply a different contract to permit a claim for unjust enrichment. *See, e.g., EAD Control Sys., LLC v. Besser Co. USA*, No. C 11–4029–MWB, 2012 WL 2357572, at *3 (N.D.Iowa June 19, 2012) ("Iowa law permits a party to plead unjust enrichment in the alternative to a breach of contract claim; ... [but] once a court determines that an express contract exists between the parties as to the subject matter at issue in the unjust enrichment claim, the unjust enrichment claim fails as a matter of law because an express and implied contract may not coexist as to the same subject matter."). In resistance, Dean Snyder argues only that it can maintain inconsistent and alternative facts and causes of action without being subject to dismissal. *See, e.g., Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 726 (8th Cir.2014) (noting that a plaintiff is allowed to plead two alternative—as opposed to duplicative—theories of liability but simply cannot recover twice (citing Fed. R. Civ. P. 8(a)(3); Fed. R. Civ. P. 8(d)(2); and Fed. R. Civ. P. 18)).

 As the Iowa Supreme Court has held

 An express contract and an implied contract cannot coexist with respect to the same subject matter, and the former supersedes the latter. Although we have held there may be a contract implied in law on a point not covered by an express contract, there can be no such implied contract on a

point fully covered by an express contract and in direct conflict therewith. *Legg v. W. Bank*, 873 N.W.2d 763, 771–72 (Iowa 2016) (internal citations and quotation marks omitted).

It is undisputed that Dean Snyder's claims against Travelers are covered by the Policy. Accordingly, under Iowa law, Dean Snyder cannot maintain an alternative claim for unjust enrichment. *See Butts v. Iowa Health Sys.*, 863 N.W.2d 36, at *9 (Iowa Ct.App.2015) (unpublished table decision) ("[T]he plaintiffs' claim for unjust enrichment fails because there is an express contract between the parties." (citing *Johnson v. Dodgen*, 451 N.W.2d 168, 175 (Iowa 1990)); *Ne. Iowa Co Op. v. Lindaman*, 843 N.W.2d 477, at *9 (Iowa Ct.App.2014) (unpublished table decision) ("Where an express contract exists on a subject matter, the law will not imply a contract under the doctrine of unjust enrichment. (citing *Smith v. Stowell*, 256 Iowa 165, 125 N.W.2d 795, 800 (Iowa 1964)).

## III. CONCLUSION

For the reasons stated, Defendant's Motion to Dismiss, ECF No. 16, must be **granted,** and the case is **dismissed.**

**IT IS SO ORDERED.**